[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 18-14808

_____

JACQUELYN JOHNSTON,

Plaintiff-Appellee,

*versus*

GARY S. BORDERS,
individually and in his official capacity as Sheriff of Lake County,
Florida,
JENNIFER FERGUSON,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:15-cv-00936-PGB-DCI

_____

———————————————

No. 19-13269

———————————————

JACQUELYN JOHNSTON,

Plaintiff-Appellee-Cross Appellant

*versus*

GARY S. BORDERS,
individually and in his official capacity as
Sheriff of Lake County, Florida,
JENNIFER FERGUSON,

Defendants-Appellants-Cross Appellees.

———————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:15-cv-00936-PGB-DCI

———————————————

Before JORDAN, NEWSOM, and TJOFLAT, Circuit Judges.

PER CURIAM:

These appeals involve two conceptually different causes of action against separate defendants.  These claims were pled together and tried to a jury empaneled for each claim.  In one claim, the plaintiff, an at-will employee of a sheriff's office, sued the sheriff, alleging that he made false and stigmatizing statements in terminating her employment that deprived her of a liberty interest in her reputation without affording her a post-termination hearing to clear her name in violation of the Due Process Clause of the Fourteenth Amendment.  In the other claim, the plaintiff alleged that a sheriff's office co-employee, whom she supervised, defamed her in violation of state tort law.  The jury found for the plaintiff on both claims.

The defendants appeal the judgments entered pursuant to the jury's verdicts in No. 18-14808.  In No. 19-13269, the sheriff appeals the judgment awarding the plaintiff an attorney's fee on the claim brought against him.  Having considered the parties' briefs and with the benefit of oral argument, we affirm the judgments in No. 18-14808 and vacate and remand for further proceedings the judgment for attorney's fee in No. 19-13269.

## I.

In October 2014, Gary S. Borders, Sheriff of Lake County, Florida (the "Sheriff"), took control of the Lake County Animal Shelter from the Board of County Commissioners amidst public

outcry over high euthanasia rates.[1]  The Sheriff intended eventually to run the shelter as a "no-kill" or "low-kill" shelter.  The terms are interchangeable, but "no-kill" is a misnomer—it simply refers to any shelter that maintains a euthanasia rate of no more than 10 percent for at least a year.  The Sheriff's plan to achieve "no-kill" status was simple: the shelter would not euthanize animals merely to create space for other animals.

On October 1, 2014, the Sheriff hired Jacquelyn Johnston as Director of Animal Services.  Before being hired, she was interviewed by the Sheriff and Major Wayne Longo—who oversaw the animal services division of the Sheriff's Office.  Both Major Longo and the Sheriff told Johnston that the shelter's euthanasia practices had been under "public scrutiny" and that the goal was to reduce euthanasia rates.  The Sheriff also told Johnston that he "wanted to make sure that all adoptable pets had the opportunity to be adopted," and that he "was interested in moving toward no-kill." At the same time, the Sheriff let Johnston know that he "understood that there would still be issues regarding public safety in cases of dangerous [] or aggressive dogs . . . [or animals] that came in very injured or ill."

On her first day of work, Johnston met with her immediate supervisors—Major Longo and Captain Todd Luce—who told her to review the governing policies that the Sheriff's Office had

---

[1] Under the Florida Constitution, Article VIII, § 1(d), the Sheriff is an officer of Lake County.

inherited from Lake County. Among the policies Johnston reviewed was one governing when animals would be eligible for euthanasia. The gist was that euthanasia was permitted only for animals that were not adoptable, and animals would generally be considered adoptable unless they were dangerous, sick, or injured. Even for unadoptable animals, euthanasia was not permitted unless alternatives—such as returning the animal to its owner or transferring the animal to a rescue facility—would be unavailable.

Major Longo and Captain Luce also introduced Johnston to Jennifer Ferguson, who would be Johnston's immediate supervisee. Because Ferguson had been working at the shelter for five months and was acting interim director before Johnston was hired, Major Longo and Captain Luce told Johnston that she would be a useful resource in learning shelter policies and practices.

After a staff meeting on October 9, 2014, Ferguson told Johnston that the shelter had received two dogs that were being kept outside because there was no room for them in the shelter. Johnston asked Ferguson whether she had contacted any rescue facilities or foster homes to house the dogs, and Ferguson replied that she had, but that they were "all full."

Johnston then did a "walkthrough" of the shelter to see whether she could find space for the dogs. The shelter was divided into two areas—the "adoption area," which was open to the public, and the "isolation area," which was not. An animal's location in either the adoption or isolation areas did not indicate whether the animal was fit for adoption. Each animal had a "kennel card" with

information about the animal, and Johnston noticed "about 10 to 15 kennel cards" in the adoption area indicating that the animals had either "bitten or attacked another animal [] or had other behavior notes." In the isolation area, by contrast, Johnston observed only one dog that had behavioral notes on its kennel card; otherwise, the isolation area contained several "friendly and young dogs." Johnston judged that the 10 or 15 dogs in the adoption area with kennel cards indicating aggression were unadoptable under the governing policy.

Johnston asked Ferguson how she ordinarily dealt with such situations, and Ferguson replied that she would usually euthanize the animals in the isolation area. Because Johnston thought euthanizing the animals in the isolation area would be contrary to shelter policy, she ordered Ferguson to "re-evaluate the dogs that were [i]n the adoption [area] since, according to [Sheriff's Office] policies and according to the notes on the kennel card[s], many of those dogs were not adoptable[.]"

Johnston left work around noon that day to attend evening classes in Miami.[2] Before she left, she told Ferguson to use Facebook to connect with rescue facilities and to try to "get some pets placed that way." And while she "understood that there were some unadoptable animals that were going to have to be euthanized," she admonished Ferguson to "follow our policies as written . . . and

---

[2] The shelter—located in Tavares, Florida—was approximately 265 miles from Miami.

to euthanize no more than necessary." Johnston did not tell Ferguson how many animals to euthanize or which animals to euthanize.

After Johnston left for Miami, Ferguson selected 23 or 24 animals for euthanization. Diane Hagan and Melanie Hollis, two euthanasia techs at the shelter, then proceeded to euthanize 20 of the animals but spared the rest because they saw no legitimate reason to euthanize them.

Hagan filled out a euthanasia log listing the reason why each animal was euthanized. She recorded that six animals were euthanized for "no space," 10 for aggression toward other animals, two for illness or injury, and two for a combination of space and health issues. Five of the notations of "no space" were written over whiteout. Hagan testified she had originally written "behavior" as the reason for those five and that she did not remember changing them to "no space."

Later that day, Ferguson had a conversation with a shelter volunteer named Whitney Boylston. She told Boylston that she had been "directed to pull or euthanize any number of animals that had been [at the shelter] over a certain amount of time." Boylston asked her why she obeyed the direction, and Ferguson replied that she feared she would lose her job if she went outside her chain of command.

The next day, Johnston received a phone call from Major Longo asking her to report to the shelter. Major Longo told

Johnston that "people were complaining" that adoptable pets had been euthanized and that "the sheriff wasn't happy and somebody was going to have to answer for what happened." Johnston indicated she was willing to "review each animal case by case and do a full investigation." But Major Longo told her she "was not going to be allowed to investigate, [] was not going to be allowed to review any records, [and] [] was not going to be allowed to talk to any of the[] [animal-rights] advocates or investigate what happened." Major Longo then told Johnston she was fired.

Later that evening, the Sheriff's Office issued the following press release with the Sheriff's approval:

> On October 10th 2014 the director of the Lake County Sheriff's Office Animal Services division was terminated from her employment. Ms. Jacquelyn Johnston was hired by the Sheriff's Office as Animal Services Director from a pool of applicants on October 1st.

> On October 9th Sheriff's Office administration became aware that several animals were euthanized under now former Director Johnston's direction and outside of the Sheriff's Office policy of utilizing euthanasia as a last resort.

> Sheriff Borders re-stated the Sheriff's Office philosophy regarding animal services as being a shelter that utilizes any means available to find homes for animals in our care and only euthanizes as a last resort.

"This decision was made on our watch and we have taken swift action to ensure it does not happen again"
— Sheriff Gary Borders.

On October 14, 2014, Johnston's attorney, Angelena Root, sent a letter to the Sheriff's Office requesting "a meeting to discuss a resolution of the current situation." The letter called the October 10 press release a "wholly fabricated version of events" which "wrongfully and publicly vilified" Johnston. In fact, it was Ferguson and not Johnston, the letter asserted, who "went completely rogue and . . . pulled far more animals than necessary and euthanized more animals than needed." "If I do not hear from anyone within five (5) business days from the date of this letter in an attempt to schedule a meeting to be had within the next two (2) weeks," Root concluded, "my client will be left with no choice but to explore all available legal options." The Sheriff's Office never responded to the letter.

Despite Johnston's belief that the Sheriff's Office press release was false and stigmatizing, she never requested a hearing to rebut the charges in the release and present her side of the story. Nor did the Sheriff's Office give her notice of her right to such a hearing.

## II.

On June 8, 2015, Johnston sued the Sheriff and Ferguson in the United States District Court for the Middle District of Florida

for compensatory and punitive damages.  Her amended complaint contained eight counts.  Count I asserted a claim against the Sheriff in his official and individual capacities under 42 U.S.C. § 1983, alleging that he denied Johnston due process of law by publishing false and stigmatizing statements in connection with her termination without thereafter giving her an opportunity to clear her name.  Counts II through V asserted defamation claims under Florida law against the Sheriff, in his official capacity, and Ferguson, and Count VI alleged a defamation claim against the Sheriff in his official capacity.[3]  Count VII alleged that the Sheriff and Ferguson violated 42 U.S.C. § 1985 by conspiring to "injure [Johnston] by ruining her professional reputation."  Count VIII alleged that the Sheriff and Ferguson violated 42 U.S.C. § 1986 in "[f]ailing to stop the conspiracy."[4]

---

[3] Counts II through V asserted different theories of defamation against Ferguson and the Sheriff in his official capacity.  Count II alleged defamation based on a theory of slander per se.  Count III alleged defamation based a theory of slander.  Count IV alleged defamation based a theory of libel per se.  Count V alleged defamation based a theory of libel.  Count VI alleged defamation based a theory of defamation by implication only against the Sheriff in his official capacity.  We refer to these theories in the singular, as the defamation claim brought by Johnston.

[4] Johnston brought Count I (and Counts VII and VIII) against the Sheriff in his individual and official capacities, invoking the District Court's federal question jurisdiction, 28 U.S.C. §§ 1331 and 1343.  The judgment the District Court entered against the Sheriff does not state that it was entered against him in his individual capacity.  We therefore treat the judgment as having been entered

The Sheriff and Ferguson separately moved the District Court to dismiss the amended complaint for failure to state a claim for relief.[5] The Sheriff argued that he was immune from suit in his *individual* capacity on Counts I, VII, and VIII on the ground that absolute immunity under Florida law protected him from suit for any false and defamatory statements he allegedly made because he made them within the scope of his employment.[6] The Sheriff sought the dismissal of Count I on an additional ground, under the federal doctrine of qualified immunity, by claiming that he could not be sued in his *individual* capacity because it was not "clearly established" that that the statements he made in connection with Johnston's termination had violated "any 'clearly established' laws." As for Count VII, the Sheriff argued that the "doctrine of intracorporate conspiracy" barred a conspiracy claim. And Count VIII failed, he argued, because its sufficiency depended on the viability of Count VII.[7]

---

against him solely in his official capacity. Johnston brought Counts II through VI against the Sheriff and Jefferson under the Court's supplemental jurisdiction, 28 U.S.C. § 1367.

[5] The Sheriff and Ferguson were represented by the same law firm throughout the litigation.

[6] *See* Fla. Stat. § 768.28(9)(a). The Sheriff's motion stood silent as to whether Count I stated a claim against him in his *official* capacity.

[7] The Sheriff moved to dismiss Counts VII and VIII in both his *official* and individual capacities.

Ferguson argued that she was entitled to absolute immunity under Florida law on Counts II through V[8] because her allegedly defamatory statements were made in the course of her duties. In the alternative, she argued that those counts should be dismissed because they failed to state facts constituting defamation.[9] On May 9, 2016, the District Court granted their motions to dismiss in part and denied them in part. The Court denied the motion to dismiss Count I—to the extent it sought damages against the Sheriff in his *individual* capacity—on two grounds. First, the Sheriff was not entitled to absolute immunity under Florida law for his allegedly false and defamatory statements because Count I was not a defamation claim. Rather, it alleged that the statements infringed Johnston's Fourteenth Amendment liberty interest in her good name and reputation, and because the Sheriff made the statements in terminating her employment, due process required that he "provide [her] a name-clearing hearing." Second, the Sheriff was not entitled to qualified immunity because the right to a name-clearing hearing was "clearly established law."[10] The Court granted the Sheriff's

---

[8] *See* Fla. Stat. § 768.28(9)(a).

[9] Ferguson argued that those counts failed to allege the five elements required to establish a claim of defamation: "(1) publication to a third person; (2) falsity; (3) negligence; (4) actual damages; and (5) statement must be defamatory."

[10] The Sheriff's motion to dismiss Count I contained no reference to Count I's allegation that the deprivation of a "name-clearing hearing" constituted a denial of due process. Rather, the motion appears to have interpreted Count I as alleging a due process claim based solely on the Sheriff's statements.

(and Ferguson's) motion to dismiss Counts VII and VIII as legally insufficient, although with leave to amend.[11]

The Court denied Ferguson's motion to dismiss Counts II through V. It rejected her arguments that she was entitled to absolute immunity under Florida law and that Counts II through V failed to sufficiently allege the elements of a defamation claim.

On receiving the District Court's rulings on their motions to dismiss, the Sheriff and Ferguson separately answered the amended complaint. They both denied the allegations of wrongdoing and asserted several affirmative defenses, as indicated below.[12]

After discovery closed, the Sheriff and Ferguson jointly moved the District Court for summary judgment. The Sheriff argued that the Count I due process claim brought against him in his *official* capacity failed because "adequate state [judicial] remedies were available" to provide Johnston with the process that was due: an "opportunity for a name clearing hearing." He argued that the

---

[11] Johnston failed to amend Counts VII and VIII, so they are not implicated in these appeals.

[12] The Sheriff's answer presented six affirmative defenses. None are pertinent here. Ferguson's answer presented four affirmative defenses. One defense, the fourth, is relevant: the defamation claim in Counts II through V were barred by the doctrine of absolute privilege under Fla. Stat. § 768.28(9)(a), because Ferguson's statements were made "in connection with her official duties." Ferguson asserted this privilege in her motion to dismiss Counts II through V as well as in the fourth affirmative defense.

Count I claim brought against him in his *individual* capacity failed because the doctrine of qualified immunity protected him from the damages Johnston was seeking.[13]  He argued that he was entitled to summary judgment on Counts II through VI because the Florida doctrine of absolute privilege barred the claims; he issued the press release containing the allegedly defamatory statements about Johnston in carrying out his duties as a Lake County executive officer.

Ferguson argued that she was entitled to summary judgment on the defamation claim of Counts II through V because her statement to Boylston, on which the claims were based, was true and, in any case, protected by a qualified privilege applicable to statements "made by managerial employees to non-managerial personnel."

On January 11, 2017, the District Court granted the Sheriff and Ferguson summary judgment.  The Court dismissed the Count I due process claim against the Sheriff, in his *individual* and *official* capacities, on the merits and declined to exercise its supplemental

---

[13] Nothing in the Sheriff's motion for summary judgment or elsewhere in the record indicated that the Sheriff was aware that the due process Johnston was entitled to, a name-clearing hearing, would be an injunction ordering him to provide such a hearing and that if Florida law could not provide one, the District Court could.  Count I, though, *did not* seek a name-clearing hearing; it sought damages only.  This explains why the Sheriff invoked the doctrine of qualified immunity in his individual capacity; it was a defense to Count I's due process claim for damages.

jurisdiction over the state law defamation claim lodged against him in Counts II through VI.

As to Count I, the District Court adhered to the position from its order on the motion to dismiss, that the Due Process Clause of the Fourteenth Amendment required the Sheriff to provide Johnston with "a meaningful opportunity to clear her name" of the reputational stigma his statements had caused. In other words, Johnston had a constitutional right to a name-clearing hearing. If the Sheriff wouldn't provide one, she could sue him in state court for an injunction ordering him to provide one. But the District Court also found that Johnston had not (yet) suffered a due process violation. Such a violation could not occur, the District Court reasoned, until Johnston had sought and failed to secure a state court injunctive order requiring the Sherriff to provide her a name-clearing hearing. The need to seek a state court injunctive order, according to the Court, stemmed from our holding in *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) (en banc). But Johnston, in her complaint, did not seek a state court injunctive order. She didn't have to, she contended, because the "Sheriff never notified her of her right to a name-clearing hearing, never offered her a name-clearing hearing, and never denied her a name-clearing hearing." The District Court was not persuaded.

> Whether a public employer deprives a terminated employee of due process by denying the employee's request for a name-clearing hearing—which did not happen in this case—or by failing to provide the

employee with notice of his or her rights to a name-clearing hearing[14]—which did happen in this case—the employee "has not suffered a *violation* of his procedural due process rights unless and until the [state] refuses to make available a means to remedy the deprivation." *McKinney*, 20 F.3d at 1563. Because an adequate state court remedy was available to Johnston, her failure to pursue that remedy dooms her procedural due process claim in this Court.[15]

Having found that Johnston failed to seek a state court injunctive order and thus suffered no due process violation, the Court granted the Sheriff summary judgment on Count I.[16] Since Johnston's only federal claim failed as a matter of law, the Court declined to exercise its supplemental jurisdiction under 28 U.S.C. § 1367 over the state-law defamation claim of Counts II through VI and dismissed them without prejudice.

Johnston appealed the summary judgment. *Johnston v. Borders*, 724 F. App'x. 762 (11th Cir. 2018). She presented two issues:

---

[14] The District Court cited *Buxton v. City of Plant City*, 871 F.2d 1037, 1042–43 (11th Cir. 1989), for its position.

[15] Query whether the Court necessarily implied that if the state failed to order the Sheriff to provide Johnston with a name-clearing hearing, it would enter an injunction ordering a hearing.

[16] The Court granted the Sheriff summary judgment on Count I in his *official* capacity but did not rule on the defense he asserted in his *individual* capacity that he was entitled to summary judgment based on the doctrine of qualified immunity.

(1) whether the record showed that she had established a violation of her due process right to a name-clearing hearing, and (2) whether the District Court erred in holding that, under *McKinney*, she could obtain an injunctive order requiring the Sheriff to provide her with a name-clearing hearing. We resolved both issues in her favor.

In deciding the first issue, we held that to establish her right to a name-clearing hearing, Johnston had to prove: "(1) a false statement (2) of a stigmatizing nature (3) attending [her] discharge (4) made public (5) by [her] government employer (6) without a meaningful opportunity for employee name clearing." *Id.* at 766 (quoting *Buxton v. City of Plant City*, 871 F.2d 1037, 1042–43 (11th Cir. 1989)). We concluded that the evidence in the record created a genuine dispute as to the sixth element. Contrary to the Sheriff's position, "releasing her complaint letter in response to a media request . . . was . . . a 'meaningful opportunity for employee name clearing.'" *Id.* (quoting *Buxton*, 871 F.2d at 1042–43).

Turning to the second issue, we held that the District Court incorrectly concluded that the Florida courts would order the Sheriff to give Johnston a name-clearing hearing.[17] *Id.* at 766–68. We rejected the Sheriff's argument that those courts would provide

---

[17] We impliedly held that, because the Florida courts would not enjoin the Sheriff to provide a name-clearing hearing, she would have to seek one from the District Court. As it turned out, though, she never sought one from the Florida courts or the District Court. Instead, she sought damages from the District Court.

Johnston with a name-clearing hearing via a writ of certiorari or a writ of mandamus. *Id.* Certiorari was unavailable because it consists of appellate court review of "the record of an inferior tribunal hearing" and no such hearing had been held. *Id.* at 766–67. Mandamus was unavailable because although the Sheriff contended that "mandamus was adequate to cure Johnston's 'lack of notice,' " *id.* at 767, a writ of mandamus wouldn't provide Johnston "a chance to clear her name."[18] *Id.* We therefore vacated the District Court's order granting the defendants' summary judgment and remanded the case for further proceedings. *Id.* at 768.[19]

---

[18] We note that this non-precedential conclusion is dubious, though, considering that the writ of mandamus in Florida is available if there was an "indisputable legal duty to perform the . . . action, and . . . no other adequate remedy [was] available." *Fla. Agency for Health Care Admin. v. Zuckerman Spaeder, LLP*, 221 So.3d 1260, 1263 (Fla. 1st Dist. Ct. App. 2017).

[19] Recall that the District Court did not rule on the Sheriff's argument that he was entitled to summary judgment on Count I brought against him in his *individual* capacity based on the defense of qualified immunity. In his answer brief in *Johnston v. Borders*, the Sheriff asked us to determine whether he was entitled to the defense. We said no.

> Several of our published decisions gave Sheriff Borders "fair warning" that his conduct was unconstitutional. We have held that government employees are entitled to a meaningful opportunity for a name clearing hearing after an employer places allegedly false and stigmatizing information in their personnel files. *See Cotton* [*v. Jackson*], 216 F.3d [1328,] 1330 [(11th Cir. 2000)]; *Buxton*, 871 F.2d at 1038, 1045–46.

*Johnston*, 724 F. App'x. at 768.

On remand, the District Court considered whether the Sheriff and Ferguson were entitled to summary judgment on the state law defamation claim it had dismissed, Counts II through VI. The Court found that the October 10, 2014, press release was issued "within the scope of the Sheriff's Office's authority" and was therefore protected by the doctrine of absolute privilege, but also that triable issues of fact existed regarding Ferguson's statement to Boylston. Accordingly, the Court granted the Sheriff summary judgment on Counts II through VI but denied it as to Ferguson.

At this point, Johnston moved the District Court to enforce our mandate in *Johnston v. Borders*.[20] She made two points relevant here. First, she argued that *Johnston* implicitly held that she was not required to satisfy the "policy or custom" requirement established by *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S. Ct. 2018 (1978), to obtain damages from the Sheriff in his official capacity on the Count I due process claim.[21] Second, she argued that *Johnston* found that,

---

[20] Johnston styled her motion as one under Federal Rule of Civil Procedure 50. The District Court found Rule 50 relief unavailable because the case had not gone to trial, so it construed Johnston's motion as one *in limine* "to set forth the trial court's understanding of the Eleventh Circuit's opinion and to provide guidance to the parties." Because the motion sought to enforce Johnston's interpretation of the mandate, we refer to it as a motion to enforce the mandate.

[21] In *Monell*, the Supreme Court held that municipalities are not subject to *respondeat superior* liability under § 1983. 436 U.S. at 691, 98 S. Ct. at 2036.

a) [she] was not informed of her right to a name clear-
ing hearing, and b) she was not given a hearing for
name clearing purposes. As a "meaningful oppor-
tunity" for name clearing, according to the Eleventh
Circuit, required a hearing at which Johnston could
"cross-examine witnesses or rebut their claims", law
of the case requires finding that this last element of
the Section 1983 claim – "without a meaningful op-
portunity for an employee name clearing" – is met
and does not require proof at trial.

The District Court agreed with Johnston's first point with
this statement:

The Eleventh Circuit . . . established six (6) elements
for a § 1983 deprivation of liberty interest claim. The
Court's pronouncement in this case is consistent with
its approach in *Buxton*, and this Court declines to add
additional elements of proof not required by the ap-
pellate court. The Eleventh Circuit is well-aware of
*Monell* and its progeny, yet, the Court omitted the
'policy, custom or usage' language from its analysis of
the elements of a § 1983 deprivation of liberty claim."

The Court disposed of the second point by interpreting
*Johnston* as holding that the Sheriff's concession that he did not
notify Johnston of her right to a name clearing hearing established

Rather, municipalities are only liable for a constitutional tort committed by
employees insofar as the tort results from a municipal policy or custom. *Id.* at
690, 98 S. Ct. at 2035–36.

the sixth element of her due process claim—that is, he denied her a meaningful opportunity to clear her name.

The case then proceeded to trial on the Count I due process claims against the Sheriff and the Count II defamation claim against Ferguson. The trial lasted nine days. Johnston's counsel called nine witnesses. Johnston testified first, followed by Major Longo and two expert witnesses. The first expert testified about the cost of cleansing internet-search-engine[22] results of negative articles about Johnston. The second testified about Johnston's lost earning capacity. Then, the two euthanasia techs who euthanized the animals, Hagan and Hollis, testified. The Sheriff, Ferguson, and Boylston were Johnston's final witnesses.

Defendants rested without presenting any evidence and moved the Court for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). Ferguson made three arguments with respect to the defamation claim. First, she argued that her statement to Boylston was not defamatory as a matter of law. Second, she argued that even if a jury could conclude that the statement was defamatory, it was nonetheless protected by an "intra-corporate . . . privilege to speak to other employees." Third, she argued that a reasonable jury could not award punitive damages

---

[22] A "search engine" is "computer software used to search data (such as text or a database) for specified information." *Search Engine*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/search%20engines. Common search engines include Google.com, Yahoo.com, and Bing.com.

because there was insufficient evidence to conclude she acted with "the malice or the intent necessary to warrant any type of punitive [damages]."

The Sheriff argued he was entitled to judgment as a matter of law on the due process claim because he "never personally denied [Johnston] a [name-clearing] hearing" and "was never advised by anyone that he should" give her a hearing.[23]  In the alternative, he argued he was at least entitled to judgment on Johnston's claim for punitive damages because such damages "require[] evil motive, callous disregard for the plaintiff's rights" and he "just [did]n't know" that Johnston was entitled to a name-clearing hearing.  The District Court granted the motion in part and denied it in part, entering judgment for the Sheriff on the punitive damages claim and sending the defamation and due process claims to the jury.

On the fifth and final day of trial, the District Court held a charge conference.  Each party submitted a set of jury instructions. The Court resolved the disputed instructions, including those on § 1983 liability and damages, and informed counsel of its final

---

[23] The *Johnston* holding that the Sheriff was not entitled to qualified immunity at the summary judgment stage, 724 F. App'x at 768, did not prevent him from raising the defense again in his individual-capacity motion for judgment as a matter of law. *See Cottrell v. Caldwell*, 85 F.3d 1480, 1488 (11th Cir. 1996). Nonetheless, the Sheriff did not raise the defense.

charge.[24]  The Court noted that Johnston could recover for emotional pain and mental anguish, tangible and intangible injury,

---

[24] The Court's damages instructions on the Count I due process claim brought under § 1983 were in relevant part as follows,

> If you find for Ms. Johnston on her 1983 claim, you must then decide the amount of damages to award her for a violation of her constitutionally protected liberty interest. You should only consider the amount of damages stemming from the failure to provide her a meaningful name-clearing opportunity. You should not consider any damages stemming from Ms. Johnston's termination because the Sheriff's Office had a right to terminate her employment. You should consider whether the statement published by Sheriff Borders or the Sheriff's Office was false concerning Ms. Johnston and was of a stigmatizing nature.

> In considering the issue of Ms. Johnston's damages, you are instructed that you should assess the amount you find to be justified by a preponderance of the evidence as full just, and reasonable compensation for all of Ms. Johnston's damages, no more or no less. . . .

> [C]ompensatory damages cover both mental and physical aspects of the injury, tangible and intangible. You should determine an amount that will fairly compensate Ms. Johnston for those claims of damages that stem from the failure to provide a name-clearing hearing. There is no exact standard to be applied. Any such award should be fair and just in light of the evidence.

> You may consider the following categories of damages to the extent you find them proved by a preponderance of the evidence and no others:

(a) emotional pain and mental anguish, including impairment of reputation and personal humiliation stemming from the failure to provide a name-clearing hearing; and,

(b) damage to her career and reputation, including lost earnings and lost earning capacity stemming from the failure to provide a name-clearing hearing.

To determine whether and how much Ms. Johnston should recover for emotional pain, mental anguish, and injury to reputation, you may consider both the mental and physical aspects of injury, tangible and intangible. Ms. Johnston does not have to introduce evidence of a monetary value for intangible things like mental anguish. You will determine what amount fairly compensates her for her claim. There is no exact standard to apply, but the award should be fair in light of the evidence. . . .

Any amounts which you allow in damages for loss of ability to earn money in the future should be reduced to their present money value, and you should state in the verdict form provided to you both the total of such future damages and their present value.

The Sheriff had no objection to these instructions. The Sheriff did challenge the sufficiency of Johnston's proof to establish the damages covered by these instructions. He did so in his post-verdict Federal Rule of Civil Procedure 50(b) and in his brief on appeal. Appellant's Br. at 39 ("III. THE DISTRICT COURT ERRED BY DENYING THE SHERIFF'S RULE 50(B) MOTION AS JOHNSTON FAILED TO PROVE ACTUAL DAMAGES CAUSALLY RELATED TO THE DENIAL OF A NAME-CLEARING HEARING."). As we hold *infra* in Part I of the merits appeal, No. 18-14808, and note 31, the District Court properly denied the motion as untimely, and we affirm. The upshot is that the Sheriff cannot argue that Johnston's proof

of damages on her due process claim was insufficient or that the above instructions were erroneous.  And the Sheriff's brief does not ask us to review the damages issues for plain error.

The Court's instructions on the damages claims against Ferguson were as follows,

> If you find in favor of Ms. Johnston, you must next consider damages, and you should consider the following elements of damage:
>
> > A, injury to reputation or health stemming from the defamatory statement; and,
> >
> > B, lost earnings, lost working time, lost earning capacity stemming from the defamatory statement.
>
> Any injury to reputation or health means any shame, humiliation, mental anguish, or hurt feelings experienced in the past or to be experienced in the future. There is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any award should be fair and just in light of the evidence.
>
> Lost earnings are earnings lost in the past and any loss of ability to earn money in the future. To be entitled to an award of lost wages, the employee must be ready, willing, and able to accept employment. If you find that Ms. Johnston voluntarily removed herself from the workforce for any period of time, you should not award lost earnings for that period of time. . . .
>
> Any amounts which you allow in damages for loss of ability to earn money in the future should be reduced to their present monetary value, and you should state in the verdict form provided to you both the actual -- pardon me -- both the total of such future damages and their present value.

damage to her career and reputation, and lost earnings. The Court then instructed the jury with no further objections.[25]

The jury returned a verdict for Johnston on both claims, awarding $65,000 in compensatory damages against Borders and the Sheriff's Office on the due process claim and $35,000 against Ferguson on the defamation claim.[26] Because the jury found that Ferguson defamed Johnston "with ill will, hostility, and intent to harm," it also awarded $100 in punitive damages against Ferguson. On October 23, 2018, the District Court entered a final judgment

---

[25] Prior to the appeal in *Johnston* and later before the trial began, the Sheriff objected to the testimony of both of Johnston's damages experts in motions *in limine*. The Court denied the motions as to the first expert, who testified as to reputational clean-up costs, and deferred ruling on the second expert's testimony until the trial. There, overruling a defense objection, the Court allowed the second expert to testify about Johnston's lost wages. Defendants had argued in their pretrial motion *in limine* that none of the experts' testimony could be traced to the Sheriff's failure to hold a name-clearing hearing. At the charge conference, Defendants objected to certain types of damages, rehashing what they had said in their motion *in limine*, but they never objected on the ground that, under *McKinney*, the remedy for the deprivation of a name-clearing hearing is an injunction ordering the employer to provide a hearing, not damages. *McKinney*, 20 F.3d at 1557; *see also Codd v. Velger*, 429 U.S. 624, 627, 97 S. Ct. 882, 883–84 (1977).

[26] The jury was not instructed to consider separately the issues of the Sheriff's liability in his individual and official capacities. Rather, the verdict form asked simply whether "a false statement was made by the Sheriff's Office or Sheriff Borders concerning Ms. Johnston" and if so, "[w]hat amount of damages, if any, should Ms. Johnston be awarded against the Sheriff's Office and Sheriff Borders for violating Ms. Johnston's constitutional rights?"

for Johnston against Borders and the Sheriff's Office in the sum of $65,000, and against Ferguson in the sum of $35,100.

On November 16, 2014, Ferguson and the Sheriff separately appealed the District Court's judgment.[27]   Four days later on November 20, Johnston moved the District Court for attorney's fees and costs,[28] and to amend the judgment to add prejudgment interest to the § 1983 claim against the Sheriff.[29]  Defendants filed a notice of non-objection to the motion, and on December 12, 2018, the District Court granted the motion to amend the judgment "to include an additional $5,000 in prejudgment interest."  The amended final judgment was entered on December 17, 2018.

On January 9, 2019, Defendants filed a renewed motion for judgment as a matter of law under Rule 50(b) and alternatively moved for a new trial under Rule 59.  They contended that the motion was timely even though made over 28 days after entry of the original judgment, *see* Fed. R. Civ. P. 50(b) & 59(b), because

---

[27] The Sheriff *served* his notice of appeal on Johnston on November 16, 2018; the notice was dated November 21, 2018, and it was entered by the Clerk on the case's docket on November 26, 2018.

[28] *See* Fed. R. Civ. P. 54.  The motion was for attorney's fees and costs to be awarded to the Law Offices of Jason Gordon, P.A.  Johnston filed a similar motion for attorney's fees and costs for Angelena Root, P.S., on November 28, 2018.

[29] *See* Fed. R. Civ. P. 59(e).  Defendants filed a notice of non-objection to the motion.

Johnston's Rule 59(e) motion "suspended the finality of the judgment" and the amended judgment "restart[ed] the time in which to file a motion under Rule 50, Rule 59, or an appeal."

Defendants presented four arguments in their renewed motion under Rule 50(b) that were not presented in their Rule 50(a) motion.  First, in order to establish the Sheriff's liability in his *official* capacity on Count I, *Monell* required Johnston to prove that his conduct was pursuant to the "policy or custom" of the Sheriff's Office and she failed to do that.[30]  Second, Johnston failed to prove that she suffered damages from Ferguson's defamatory statement.  Third, Johnston failed to prove damages resulting from the denial of a name-clearing hearing.  Fourth, Ferguson's defamatory statement was protected by the *absolute* privilege that covers statements made by public officials "in the course of [their] duties" and not just the "intracorporate" *qualified* privilege, as she argued in the Rule 50(a) motion.

On June 28, 2019, the District Court denied Defendants' renewed Rule 50(b) motion as untimely.  Johnston's Rule 59(e) motion to alter the judgment did not, in the Court's view, toll the clock for filing a Rule 50(b) or 59 motion, because Johnston's 59(e) motion "address[ed] prejudgment interest only" and "Defendants' Motion [was] completely unrelated to prejudgment interest."  On July 19, 2019, Defendants filed an amended notice of appeal, which

---

[30] This was an argument the Sheriff had made in opposition to Johnston's pretrial motion *in limine.*

included among the orders appealed the District Court's denial of their renewed Rule 50(b) motion.

## Merits Appeal (No. 18-14808):

### I.

As a preliminary matter, we need not address the grounds presented to the District Court for the first time in Defendants' Rule 50(b) motion—grounds which the District Court itself did not address.[31]

---

[31] District courts lack authority to grant a Rule 50(b) motion on a ground not previously raised in a Rule 50(a) motion prior to the submission of the case to the jury. *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 902–03 (11th Cir. 2004); Fed. R. Civ. P. 50 advisory committee's note to 2006 amendment ("A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion."). Thus, we will not review arguments raised only in a Rule 50(b) motion. *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 812–13 (11th Cir. 2015).

Defendants ask us to reverse the District Court's refusal to enter judgment as a matter of law on the basis of several arguments they raised only post-verdict and which the District Court never addressed. Specifically, they challenge the sufficiency of the evidence on damages for both claims; the Sheriff argues that he was entitled to judgment as a matter of law on the due process claim because *Monell*'s "policy or custom" requirement was not satisfied; Ferguson argues that her statement to Boylston was protected by absolute privilege because she made the statement within the scope of her official duties. We do not address these arguments because they were not preserved for our review. *Big Apple Consulting*, 783 F.3d at 813.

In subpart A below, we address the Sheriff's argument that the District Court abused its discretion in refusing to instruct the jury on *Monell* as an element of the due process claim in Count I. In subpart B, we address the argument that the evidence was insufficient for a jury to find that the Sheriff or his staff made false and stigmatizing statements about Johnston (a precondition to her procedural due process right to a name-clearing hearing). In Part II, we address Ferguson's argument that her statement to Boylston was non-defamatory as a matter of law, and further explain why her argument based on an absolute privilege is not before us. After this appeal, we address the issues relating to the separate appeal on the award of attorney's fees and costs.

## A.

Before trial, the District Court determined that *Johnston v. Borders* established as law of the case that Johnston was not required to prove that she was deprived of a name-clearing hearing pursuant to a municipal policy or custom under *Monell*. We review a district court's application of the law of the case doctrine *de novo*. *United States v. Bobo*, 419 F.3d 1264, 1267 (11th Cir. 2005).

The Sheriff argues that the District Court erred in concluding that Johnston did not have to prove that her constitutional injury resulted from a policy or custom under *Monell*. Johnston defends the District Court's determination on four grounds. First, she insists that *Johnston* established the six elements of the due process claim and they became the law of the case. And since *Johnston*

did not list *Monell* among those elements, it is also the law of the case that she wasn't required to show that the Sheriff acted pursuant to a policy or custom.  Second, she claims that the Sheriff is estopped from asserting that *Monell* was an element of her due process claim because the parties' joint pretrial stipulation listed the elements of the claim without mentioning *Monell*.  Third, Johnston asserts in a footnote that the Sheriff in his *official* capacity is not a municipal entity because he "operates independently from Lake County[,] [] has [his]own budget[,] and is defending this case under [his]  own insurance policy having nothing to do with Lake County."  And fourth, even if *Monell* did apply as an element of her due process claim, it is of no moment because the evidence at trial showed that *Monell* was satisfied as a matter of law.

We agree that the Sheriff conceded that *Monell* was not an element of Johnston's due process claim in the parties' pretrial stipulation.  The Sheriff agreed that Johnston need only prove the six elements laid out in *Cotton v. Jackson*, 216 F.3d 1328 (11th Cir. 2000), to prevail on her due process claim; indeed, neither *Monell* nor any "policy or custom" issue is anywhere to be found in the issues of law to be tried in the same stipulation.  While parties cannot bind the court to an interpretation of the law via a pretrial stipulation, they can stipulate to the issues to be tried.  *See United States v. One 1978 Bell Jet Ranger Helicopter*, 707 F.2d 461, 462–63 (11th Cir. 1983); *Morrison v. Genuine Parts Co.*, 828 F.2d 708, 709 (11th Cir. 1987) (noting that a "district court has broad discretion in determining whether to hold a party to its stipulation").  In

essence, this precludes our review because the Sheriff admitted *Monell* was not an issue to be tried. We feel obligated (based on the precedential value of this case) to note in passing, however, that *Johnston* did not hold, either explicitly or implicitly, that *Monell* did or did not apply to due process claims under *Buxton*. That issue was simply not before the Court.

### B.

We review a district court's denial of a Rule 50(a) motion for judgment as a matter of law *de novo*. *Gowski v. Peake*, 682 F.3d 1299, 1310 (11th Cir. 2012). The question is whether a legally sufficient evidentiary basis exists for a reasonable jury to find for the nonmoving party. *Id.* In answering the question, we view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in her favor. *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016).

The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. A government employee's liberty interests are implicated, and with them the requirements of procedural due process, whenever a state terminates the employee and makes a "charge against him that might seriously damage his standing and associations in his community." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573, 92 S. Ct. 2701, 2707 (1972). In this situation, "where a person's good name, reputation, honor, or integrity is at stake

because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id.* (alterations adopted) (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S. Ct. 507, 510 (1971)).

Thus, we have held that when an employer publishes a false and stigmatizing statement about an employee in connection with her discharge, due process requires a meaningful opportunity to clear one's name—through what is called a "name-clearing hearing," upon request—whether before or after the termination or publication. *Buxton*, 871 F.2d at 1046; *Cotton*, 216 F.3d at 1330. The purpose of such a hearing is "not to avert the unjustified denial of a specific benefit, but to allow the aggrieved party to 'clear his name.' " *Buxton*, 871 F.2d at 1046 (quoting *Codd v. Velger*, 429 U.S. 624, 627, 97 S. Ct. 882, 884 (1977)). To recover, a plaintiff must show that "(1) a false statement, (2) of a stigmatizing nature, (3) attending a governmental employee's discharge, (4) [was] made public, (5) by the governmental employer, (6) without a meaningful opportunity for an employee name clearing hearing." *Cotton*, 216 F.3d at 1330 (alterations in original) (quoting *Warren v. Crawford*, 927 F.2d 559, 565 (11th Cir. 1991)).

The Sheriff argues that he was entitled to judgment as a matter of law because Johnston failed to establish the first two

34                    Opinion of the Court                    18-14808

elements—that is, that "Sheriff Borders or any Sheriff's Office personnel made false, stigmatizing statements concerning Johnston."[32]

Because we conclude a reasonable jury could find that the October 10, 2014, press release—which the Sheriff admits he approved—was false and stigmatizing, we affirm the District Court's decision to deny the motion.

The Sheriff's press release stated:

On October 10th 2014 the director of the Lake County Sheriff's Office Animal Services division was terminated from her employment. Ms. Jacquelyn Johnston was hired by the Sheriff's Office as Animal Services Director from a pool of applicants on October 1st.

On October 9th Sheriff's Office administration became aware that several animals were euthanized under now former Director Johnston's direction and outside of the Sheriff's Office policy of utilizing euthanasia as a last resort.

---

[32] We note that the sixth element—whether the Sheriff provided a meaningful opportunity for a hearing—is not before us. The District Court in its instructions to the jury stated that Defendants agreed that there was no meaningful opportunity for a hearing. Moreover, Defendants did not appeal this instruction or brief the issue. Thus, we need not address the "meaningful opportunity" element of Johnston's due process claim.

> Sheriff Borders re-stated the Sheriff's Office philosophy regarding animal services as being a shelter that utilizes any means available to find homes for animals in our care and only euthanizes as a last resort.

> "This decision was made on our watch and we have taken swift action to ensure it does not happen again"
> — Sheriff Gary Borders.

The press release made two separate assertions about Johnston's actions that a jury could reasonably believe to have been false. First, the assertion that "several animals were euthanized under now former Director Johnston's direction" may be true if construed in one sense and false if construed in another. "Direction" means "guidance or supervision of action, conduct or operation." Webster's Third New International Dictionary 640 (1993). And Johnston did, in fact, direct or guide Ferguson to euthanize animals in the simple sense that she told Ferguson, her subordinate, to euthanize animals to the extent necessary.

However, the press release can also reasonably be read to imply that Johnston played a more active role in selecting the particular animals and the number of animals to euthanize. *See* Webster's Third New International Dictionary 2296 ("supervise" means "to coordinate, direct, and inspect continuously and at first hand the accomplishment of"). If taken in this sense, the press release would convey a false impression, given that Johnston left for Miami directly after telling Ferguson to euthanize animals and did not learn any details of what unfolded until the next day. Therefore, a

reasonable jury could conclude the statement was false. *See Southard v. Forbes, Inc.*, 588 F.2d 140, 143 (5th Cir. 1979) ("If the publication has no necessarily defamatory meaning, but can be understood in more than one way, one of which is defamatory, then it is for the jury to decide if . . . the publication in fact had that defamatory meaning."); *see also Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 705 (Fla. 3d Dist. Ct. App. 199) ("If the statement is capable of more than one meaning, however, the trier of fact should determine whether the language used was actually understood in its defamatory sense.").[33]

Second, a reasonable jury could find that the press release falsely stated that Johnston ordered animals to be euthanized in a manner contrary to Sheriff's Office policy. According to the press release itself, the Sheriff's policy was to "utilize[] any means available to find homes for animals . . . and [to] only euthanize[] as a last resort." Johnston argues this statement misrepresented the policy and therefore constitutes a false statement in and of itself because the Sheriff's Office did not have a written policy containing the precise words "last resort." But "[s]light inaccuracies of expression are immaterial provided that the . . . charge is true in substance," and we find the statement was a largely accurate summary of the policy

---

[33] All decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

in effect.  Restatement (Second) of Torts § 581A cmt. f (Am. Law Inst. 1977).

The euthanasia policy in effect on October 9, 2014, appears to have been a combination of the written policy inherited from Lake County and an unwritten rule of the Sheriff's Office.[34]

The Lake County policy stated:

Euthanasia is reserved only for situations involving animals that cannot besafely [*sic*] handled – either because of aggression or contagious disease, or in situations where the animal is suffering and a reasonable level of treatment would not be effective at providing a good quality of life. Prior to a euthanasia decision being made, all other options are explored including: return to owner (if an owner can be identified),

---

[34] Johnston's brief makes much of the fact that the Sheriff's rule was unwritten.  But we reject Johnston's assumption that an unwritten policy is no policy at all.  A "policy" is "a definite course or method of action selected . . . from among alternatives and in the light of given conditions to guide and usu[ally] determine present and future decisions" or "a specific decision or set of decisions designed to carry out such a chosen course of action."  Webster's Third New International Dictionary 1754.  No reasonable reader could take as false the statement that Johnston ordered euthanasia "outside of the Sheriff's Office policy" merely because part of the policy was unwritten.  *See* Restatement (Second) of Torts § 563 cmt. c ("The question to be determined is whether the communication is reasonably understood in a defamatory sense by the recipient. . . . In determining the reasonableness of the recipient's understanding, that meaning is to be given to words which is ordinarily attached to them by persons familiar with the language used."); *see also Southard*, 588 F.2d at 143.

adoption, transfer to a rescue group or shelter capable
of providing better care and/or rehabilitation, and
treatment.

The Sheriff's unwritten rule about euthanasia was expressed
in various ways at trial. The Sheriff explained "the goal was to not
euthanize animals that we could adopt out and for space." Stated
slightly differently, animals would not be euthanized "solely be-
cause of space" or "simply because of lack of space." Major Longo
similarly articulated the rule as prohibiting animals from being "put
down for space and space alone."

Reading the Lake County policy together with the Sheriff's
unwritten rule, the following composite policy emerges: Euthana-
sia would be permissible if and only if (1) the animal was sick, in-
jured, or dangerous (i.e., unadoptable); (2) "all other options" had
been explored; and (3) the reason for the euthanasia was not *solely*
to create space.

A jury could reasonably find that the instructions Johnston
gave Ferguson before leaving for Miami were consistent with this
policy. Johnston cautioned Ferguson against euthanizing the dogs
in the isolation area because she observed that many of them were
"friendly and young" (i.e., were adoptable), whereas several dogs
in the adoption area had "either bitten or attacked another animal"
or "had other behavioral [issues]" (i.e., were unadoptable). More-
over, before resorting to euthanasia, Johnston asked Ferguson
whether she had contacted rescue facilities and foster homes. Fi-
nally, just before she left for Miami, Johnston again told Ferguson

to reach out to rescue facilities on Facebook and admonished her to "follow our policies as written . . . and to euthanize no more than necessary."

To be sure, it was the arrival of two dogs for which the shelter lacked space that instigated the euthanasia. And at least six animals were apparently euthanized for no reason other than to create space. However, Johnston generally directed Ferguson toward animals with qualities that justified euthanasia under the policy—in other words, animals that could be euthanized for some reason other than mere space creation. Thus, a reasonable jury could find that Johnston's instructions did not contravene Sheriff's Office policy.

The question remains whether the press release was stigmatizing to Johnston. As stated in *Johnston*, "there is no doubt" that it was so. *Johnston*, 724 F. App'x at 766. "That Johnston received death threats and cannot find work illustrates the stigma that attaches to [the press release]." *Id.*

## II.

To prove defamation under Florida law, a plaintiff must establish the following elements:

> (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4)

actual damages; and (5) statement must be defamatory.

*Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1105–06 (Fla. 2008) (citing Restatement (Second) of Torts §§ 558B, 580A–580B).

Words are defamatory under Florida law when "they tend to subject one to hatred, distrust, ridicule, contempt or disgrace or tend to injure one in one's business or profession." *Am. Airlines, Inc. v. Geddes*, 960 So. 2d 830, 833 (Fla. 3d Dist. Ct. App. 2007) (citation and quotation marks omitted). Even if the words are not literally false, they may still be defamatory if "the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts." *Jews for Jesus*, 997 So. 2d at 1108.

In determining whether language is defamatory under Florida law, "[t]he publication made should be construed as the common mind would understand it," and not "in their mildest or most grievous sense." *Loeb v. Geronemus*, 66 So. 2d 241, 245 (Fla. 1953). The publication must also be "considered in its totality" and in context rather than piecemeal and in isolation. *Byrd v. Hustler Mag., Inc.*, 433 So. 2d 593, 595 (Fla. 4th Dist. Ct. App. 1983) (citation omitted); *see Jews for Jesus*, 997 So. 2d at 1107. Where a statement is subject to two possible interpretations and one is defamatory, it is for the jury to decide whether the statement is in fact defamatory. *Hallmark Builders, Inc. v. Gaylord Broad. Co.*, 733 F.2d 1461, 1463 (11th Cir. 1984).

Ferguson argues she was entitled to judgment as a matter of law because no reasonable jury could have found that she made a defamatory statement about Johnston.[35]  According to Ferguson, her statement to Boylston could not have been defamatory because the statement was not false and because she did not specifically mention Johnston by name.

Johnston's defamation claim was based on Ferguson's statement to Boylston on October 9 after the animals were euthanized. Specifically, Ferguson told Boylston she "was directed to pull or euthanize any number of animals that had been [at the shelter] over a certain amount of time."  Although Ferguson did not expressly say Johnston was the one who told her to euthanize the animals, she did tell Boylston she did not resist the instruction because she was worried she would lose her job if she went outside the chain of command.

A reasonable jury could find the statement was false because Johnston did not direct Ferguson to euthanize animals "that had been [at the shelter] over a certain amount of time."  Rather, she directed Ferguson to euthanize animals that were documented as having behavioral or medical issues that made them unadoptable.

---

[35] Ferguson also argues that Johnston failed to prove the fourth element—actual damages—but as we said in Part I of this appeal, No. 18-14808 *supra*, that argument has not been preserved because it was raised for the first time in Defendant's renewed motion for judgment as a matter of law.

A jury could also reasonably infer that the statement was *about* Johnston and that Boylston understood it to be so. Although Ferguson did not mention Johnston's name, she did say she was "directed" to euthanize the animals and was afraid to resist the direction because of the "chain of command." Boylston knew Ferguson was directly supervised by Johnston and she therefore could have inferred that Johnston was the one who gave the command. *See* Restatement (Second) of Torts § 564 cmt. b ("It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended. Extrinsic facts may make it clear that a statement refers to a particular individual although the language used appears to defame nobody."). We therefore reject Ferguson's argument that the statement was not defamatory as a matter of law.

Ferguson argues in the alternative that her statement to Boylston was protected by the doctrine of absolute privilege; so, the District Court erred, she argues, in denying her motion for judgment as a matter of law or, if not, in refusing to instruct the jury on the doctrine. We find, however, that Ferguson neither raised the doctrine of absolute privilege in her Rule 50(a) motion nor requested the Court to instruct the jury on it. Rather, she requested the Court to instruct the jury on the doctrine of *qualified* privilege. The Court held that that doctrine did not apply. Ferguson does not challenge its ruling here. Thus, we limit our

discussion to absolute privilege issues, which we find was forfeited at the District Court level.

Generally speaking, the qualified privilege inquiry looks to whether the speaker and the listener share a legitimate mutual interest in the message conveyed, *see Thomas v. Tampa Bay Downs, Inc.*, 761 So. 2d 401, 404 (Fla. 2d Dist. Ct. App. 2000); *Drennen v. Westinghouse Elec. Corp.*, 328 So. 2d 52, 55 (Fla. 1st Dist. Ct. App. 1976), while the question regarding absolute privilege—which is only available to public officials—is "whether the communication was within the scope of the officer's duties," *City of Miami v. Wardlow*, 403 So. 2d 414, 416 (Fla. 1981). Ferguson relied on the doctrine of qualified privilege in her motion for summary judgment, in her proposed jury instructions, and in her Rule 50(a) motion for judgment as a matter of law. Unlike the Sheriff—who successfully raised the absolute privilege defense in moving for summary judgment—Ferguson never used the phrase "absolute privilege" or otherwise argued she was a public official acting within the scope of her duties.

To be sure, Ferguson did raise the absolute privilege argument in her Rule 50(b) renewed motion for judgment as a matter of law, but the District Court, finding the motion untimely, never reached the issue. And even if it had, the argument that Ferguson was entitled to judgment on the defamation claim because of absolute privilege would have been barred by the rule that "[a] post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." Fed. R. Civ. P. 50 advisory

44                    Opinion of the Court                    18-14808

committee's note to the 2006 amendment; *see also McGinnis*, 817
F.3d at 1262.

"[A]s a court of appeals, we review claims of judicial error in
the trial courts," and it is therefore a deviation "from the essential
nature, purpose, and competence of an appellate court" to address
questions not passed upon by a district court. *Access Now, Inc. v.
Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004). Accordingly,
we do not address Ferguson's absolute privilege argument.

Attorney's Fee Appeal (No. 19-13269):

## I.

On November 20, 2018, following the entry of the final judg-
ment in this case, Johnston moved the District Court pursuant to
42 U.S.C. § 1988,[36] to award her an attorney's fee of $173,572,[37] for
the work performed by the Law Offices of Jason Gordon, P.A., in
litigating her due process claim under 28 U.S.C. § 1983 and the costs

---

[36] Section 1988 states,

> In any action or proceeding to enforce a provision of sections
> 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, . . . the
> court, in its discretion, may allow the prevailing party, other
> than the United States, a reasonable attorney's fee as part of
> the costs . . . .

§ 1988(b).

[37] For convenience, the numbers indicating attorney's fees and costs are
rounded down to the nearest dollar.

the Offices incurred, $17,452.[38]  Eight days later, Johnston filed a similar motion for the work performed by Angelena M. Root, P.A.[39]  The motion asked for an attorney's fee of $395,415 and costs of $25,466.  Defendants opposed both motions.  Among other things, they argued that Johnston was requesting attorney's fees for work they performed in litigating her state-law defamation claim, work that was not compensable under § 1988.

On January 29, 2019, the District Court held a status conference on Johnston's motions and denied them without prejudice with this statement,

> Because of the piecemeal, belated, and deficient briefing associated with the foregoing motions, and for the reasons further stated on the record, the Court finds that the foregoing motions are due to be denied

---

[38] On April 17, 2018, our mandate issued in *Johnston v. Borders.*  Three days later, on April 20, 2018, Johnston entered into an "Engagement Agreement" with the Law Offices of Jason Gordon, P.A. ("Gordon").  Johnston agreed to pay Gordon $375 per hour plus monthly expenses for representing her in this case.

[39] Angelena M. Root's representation of Johnston preceded Gordon's by three and a half years.  At the time Johnston hired Root, Root was a Ft. Lauderdale, Florida, lawyer in her second year of law practice.  On June 8, 2015, in a letter from Root to Johnston (which Johnston signed "agreed and accepted"), Root undertook Johnston's representation *nunc pro tunc* to October 11, 2014, at an hourly rate of $200 plus expenses payable monthly.  On October 14, 2014, Root wrote the Sheriff's Office requesting "a meeting to discuss a resolution of the current situation."  Johnston gave Root a $10,000 "refundable retainer."  On June 9, 2015, Root filed the complaint that commenced the instant action.

without prejudice to allow the relief requested to be re-pled (and opposed) in a concise and orderly manner.

On March 1, 2019, Johnston filed a renewed motion for attorney's fees and costs. Using the "lodestar" method,[40] she requested fees for the work of Jason Gordon's Office: $180,768 in attorney's fees and $10,057 in paralegal fees. However, though the language in the fee application is vague, our calculations show that the correct number is $170,711 in attorney's fees and $10,057 in paralegal fees. Gordon billed for 510.7 hours at a rate of $375 per hour, totaling $191,512. He reduced these hours by $20,801,[41] which resulted in an attorney's fee of $170,711. Gordon's paralegal billed 74.5 hours at a rate of $135 per hour, totaling $10,057. So,

---

[40] Under the lodestar method, district courts determine attorney's fees based on the product of the hours reasonably spent on a case multiplied by a reasonable hourly rate. *Ne. Eng'rs Fed. Credit Union v. Home Depot, Inc.* (*In re Home Depot*), 931 F.3d 1065, 1076 (11th Cir. 2019). The resulting product is known as the lodestar, which is strongly presumed to represent an appropriate attorney's fee. *Id.* at 1082. In exceptional circumstances, a district court may enhance a fee by applying a multiplier to the lodestar. *Id.* With certain exceptions, a district court generally must reduce a proposed lodestar to account for the attorney's limited success in the litigation. *See Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1302 (11th Cir. 1988).

[41] Gordon reduced his fee by $2,062 for travel time and by $18,738 for billing judgment, for a total reduction of $20,801.

18-14808                Opinion of the Court                47

Gordon claimed a lodestar of $180,768, the sum of $170,711 in attorney's fees and $10,057 in paralegal fees.[42]

For the work of Angelena Root's Office, Johnston claimed $318,570 in attorney's fees and paralegal fees of $16,635.   Root billed a total of 1,334 hours.  Root billed 1230.8 of those hours at her attorney rate of $300 per hour, totaling $369,240.[43]  Her fees were reduced by $50,670, so she claimed an attorney's fee of $318,570.  Root billed 110.9 of the 1,334 hours at her paralegal rate of $150 per hour, totaling $16,635.  Together, these totaled a lodestar of $335,205.  According to Johnston, the work that the attorneys and paralegal performed yielded a combined lodestar of $526,031—though, adjusting for a calculation error made by Gordon, the correct number is $515,973.[44]  Johnston also requested a 20 percent enhancement to the lodestar because, according to Johnston, the case was "exceptional."  Finally, Johnston sought costs of $24,765 for Jason Gordon's Office and $28,109 for Angelena Root's Office.

---

[42] Gordon made an error at the end of the application by claiming $180,768 in attorney's fees and $10,057 in paralegal fees, which counts twice the paralegal fees of his office, when he was only entitled to claim $180,768 in attorney's fees and paralegal fees combined.

[43] Although Root initially stated that she billed 1334 hours at an hourly rate of $300, she later made clear that this 1334 figure included 110.9 hours of paralegal time.

[44] As explained *supra* in note 42, Gordon double counted his paralegal's work, and so the lodestar of $526,031 needs to be reduced by $10,057.

Johnston represented that the hourly rates the attorneys charged were reasonable and the time they and the paralegal spent on the case was devoted to the presentation of her § 1983 due process claim against the Sheriff. She supported her fee requests with charts showing the hours the attorneys and the paralegal worked on the case. The charts covered their work on the due process claim and the defamation claim against the Sheriff and Ferguson as well. The charts, apparently based on documents the attorneys compiled daily for monthly billing purposes, presented a brief description of the work performed on a given date and the time spent doing it. Notably, with minor exception, the entries—specifically the descriptions of the work performed—did not specify whether the work was performed on the due process claim or the defamation claim or both.

Defendants responded to Johnston's renewed motion on March 15, 2019.[45] Pointing to the charts, they objected to the hours

---

[45] Ferguson joined the Sheriff in responding to Johnston's renewed motion even though Johnston could not recover an attorney's fee against her pursuant to § 1988. Ferguson nonetheless thought that Johnston was seeking attorney's fees against her given these statements in Johnston's renewed motion,

> Johnston obtained a jury verdict in her favor as to both her Section 1983 claim and her state law defamation claim. There is no dispute that Johnston is the prevailing party in this matter for purposes of attorney's fees under Section 1988. . . . The result in this case was a complete vindication of Johnston's liberty interest and state law rights she alleged were violated by

18-14808            Opinion of the Court            49

billed based on "block billing,"[46] duplicative entries, vagueness, excessiveness, and travel time. Moreover, they contended that, due to Johnston's "limited success," the lodestar she proposed should be reduced by 60 percent.

The District Court referred the renewed motion for attorney's fees and costs to a Magistrate Judge for a report and recommendation ("R&R").[47] The Magistrate Judge considered the motion solely based on Johnston's submission (the charts and the expert's opinion) and Defendant's objections, and he did so without oral argument.

On June 19, 2019, the Magistrate Judge issued his R&R. He recommended that the District Court "calculate the lodestar as $367,369," that the Court "reduce that lodestar amount by 25

---

Defendants as Johnston obtained a verdict in her favor on each of those claimed violations.

[46] Block billing is defined as billing multiple unrelated tasks in one billing entry, such that it becomes "difficult, if not impossible, to calculate with any precision the number of hours an attorney devoted to a particular task." *Barnes*, 168 F.3d at 429. For example, an attorney might detail all of their day's work in one entry—saying that they spent 12 hours writing a memo, talking to the client, preparing for a deposition, and reviewing evidence. A court looking at this entry would be unable to tell whether the lawyer spent 11 hours drafting the memo and one hour doing the other tasks, or whether the lawyer spent 11 hours talking to their client. In this case, the block billing generally failed to differentiate whether the attorney was working on the due process or state-law defamation claim.

[47] *See* 28 U.S.C. § 636(b)(1).

percent to account for Plaintiff's limited success in this case," and that the Court "award Plaintiff attorney fees in the amount of $275,526 and costs in the amount of $18,333."[48]

---

[48] Johnston was not entitled to recover an attorney's fee under § 1988 or any other rule of law for prevailing against Ferguson on her defamation claim. But the Magistrate Judge, in calculating the lodestar for the attorney's fee, $275,526, and in recommending that the District Court award Johnston an attorney's fee in that amount, included the work the attorneys and paralegal performed in litigating the defamation claim against the Sheriff (which were dismissed) and Ferguson. (As we explain *infra*, by including the work the attorneys and the paralegal performed in litigating the defamation claim in the lodestar, the District Court erred.) The District Court adopted the Magistrate Judge's recommendation but ordered the attorney's fee imposed against all Defendants rather than the Sheriff alone. The judgment the Clerk of the District Court entered in response to the Court's order was therefore entered against all Defendants—the Sheriff, the Sheriff's Office, and Ferguson.

On appeal, Ferguson challenges the assessment of attorney's fees against her personally (as opposed to the Sheriff's liability for the time spent on the defamation claim against Ferguson—which we address *infra* Part II.B). We are of the opinion that Ferguson is liable for costs, under Federal Rule of Civil Procedure 54(d), because Johnston prevailed against her in a case in federal court. *See Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1321 (11th Cir. 2001). However, Ferguson is not liable for attorney's fees (unlike the Sheriff), because Johnston did not prevail against Ferguson on a fee-shifting claim, and the § 1983 claim against the Sheriff was not related to Johnston's state law defamation claim against Ferguson. *See Kentucky v. Graham*, 473 U.S. 159, 168, 105 S. Ct. 3099, 3106 (1985) ("[F]ee liability runs with merits liability; . . . Section 1988 simply does not create fee liability where merits liability is nonexistent.").

In our disposition of this appeal, we direct the Clerk to amend the judgment on attorney's fees and costs to reflect that it applies to the Sheriff

The Magistrate Judge arrived at the attorney's fee award using the lodestar method, in which he determined reasonable hourly rates for the time Gordon, Root, and the paralegal separately spent on the case.[49]  He did so on the basis of the charts Johnston presented and the expert witness' opinion as to the reasonableness of the hours the attorney's worked and their hourly rates.  The expert stated that Gordon's and Root's hours should be reduced for excessiveness, and the Magistrate Judge agreed.  That point aside, in reviewing the time the attorneys spent as depicted in the charts, the Magistrate Judge, in examining the chart's descriptions of the work performed, found it "difficult, if not impossible" to assess the reasonableness of several billing entries due to block billing.  Although Johnston was unable to prove by a preponderance of the evidence the number of hours spent on each compensable task, the Magistrate Judge nonetheless found that a reduction of 10 percent of Gordon's hours and 15 percent of Root's hours was appropriate to account for block billing and excessiveness of hours.  His findings were arbitrary in that they were not based on what the charts disclosed; rather, his findings were the product of pure guesswork.  The Magistrate Judge also cut the attorney's travel time from the

---

only as to the attorney's fees and to the Sheriff and Ferguson as to costs.  In discussing the matter of the § 1988 attorney's fee award *infra,* we accordingly omit reference to Ferguson.

[49] The Sheriff does not challenge these hourly rates on appeal.

hours they spent on the case.  He did so because Johnston failed to show that satisfactory local attorneys were not available.[50]

The Magistrate Judge made several other rulings in fixing the lodestar at $367,369.  First, he denied Johnston's request for a 20 percent enhancement to the lodestar because, to her, the case was "exceptional."  Second,  he reduced the lodestar Johnston proposed to account for her limited success on the due process claim: she sought $4,200,000, and the jury awarded her only $100,100.  Third, he denied Defendant's request to reduce the lodestar Johnston proposed by 60 percent.  He did reduce it by 25 percent, though.  Finally, he rejected Defendant's request to reduce the lodestar because the state-law defamation claim against Ferguson was unrelated, finding that it was related to the due process claim against Borders.[51]

---

[50] The trial was held in Orlando, Florida, and both Root and Gordon maintained their offices in the Ft. Lauderdale area.

[51] In determining the lodestar, the Magistrate Judge did not differentiate between the time Gordon, Root, and the paralegal spent on the due process claim and the defamation claim because he concluded that the claims had (1) stemmed from the "same nucleus of fact" and (2) that the hours were impossible to adequately apportion the time spent on each claim.  He drew this two-part test from Fifth Circuit precedent in *Church of Scientology of California v. Cazares*, 638 F.2d 1272, 1290 (5th Cir. 1981).  Because the Magistrate Judge found that the defamation claim against Ferguson and the due process claim against the Sheriff met this two-part test, he concluded that the claims were related and thus the hours spent on litigating Ferguson's claim were compensable under § 1988.

After addressing the attorney's fee issues, the Magistrate Judge turned to Johnston's request for the imposition of costs under Federal Rule of Civil Procedure 54(d)(1).  Defendants challenged the following costs: (1) expert fees, including cost of travel and lodging for experts; (2) travel expenses; (3) a transcript of a local media story; (4) videotaping a deposition of retired Major Longo; (5) meals, postage, and parking at the courthouse as overhead; (6) copies of case law, transcripts, and expert reports for trial; (7) transcripts of certain recordings; and (8) rush service on subpoenas. Due to a lack of documentation and justification, the Magistrate Judge concluded that Johnston failed to carry her burden of proof on these items and reduced her costs to $18,333.

Both sides filed objections to the R&R, reiterating for the most part the objections they had tendered to the Magistrate Judge.[52] The District Court overruled their objections and adopted

---

[52] The Sheriff presented four interrelated objections.  He argued that the Magistrate Judge erred (1) in relying on inadequate records that included time spent on the defamation claim; (2) in finding the defamation claim against Ferguson related to the § 1983 due process claim against the Sheriff and thus compensable; (3) in not reducing the lodestar to account for Johnston's failure to prevail on the defamation claim against him in his official capacity; and (4) in failing to reduce the lodestar to account for the time the attorney's spent on the due process claim only.  Johnston presented three objections to the attorney's fee award.  Johnston argued that the Magistrate Judge erred (1) in reducing the lodestar for block billing; (2) in refusing to include travel time in the lodestar; and (3) in reducing the lodestar for limited success.  She also objected to the Magistrate Judge's denial of some of her requested costs pursuant to Defendants' objections.

the R&R's resolution of the attorney's fee issues.  But the Court differed with its resolution of an item of costs.  The Court agreed with Johnston that the meal and lodging expenses incurred by counsel during trial were recoverable and awarded her costs of $20,079.98.  Defendants now appeal the District Court's attorney's fee award.  Johnston cross-appeals the Court's refusal to award the attorney's fees she requested and the denial of certain costs.

## II.

Defendants present two arguments on appeal.  First, the District Court erred in including the time Johnston's attorneys spent on her defamation claim, which was not compensable under § 1988, in the lodestar for the § 1988 attorney's fee awarded against the Sheriff on the due process claim.  More broadly, Defendants argue that there is "no legal basis to award fees [to Johnston] for . . . prevailing" against them on the defamation claim at all.  Second, the District Court erred in not reducing the lodestar to account for Johnston's limited success on her due process claim; she received only a fraction of the damages she sought.

On cross-appeal, Johnston presents three arguments.  First, Johnston argues that the District Court improperly reduced the lodestar for block billing, excessive billing, and travel time.

Second, Johnston argues that the District Court erred in reducing the lodestar for limited success on her due process claim for three reasons. She first argues that she vindicated important rights. Thus, a reduction based on the amount of her recovery was too

mathematical.  Second, she argues that courts should not reduce the lodestar when there are multiple claims based on "common facts and related legal theories," and only some related theories fail. The time her attorneys spent on her defamation claim, she argues, was properly included in the lodestar because those claims were intertwined with the due process claim; hence, the District Court's ruling was correct on this point.  And third, she argues that the reductions to the lodestar improperly discounted her prior successes, such as her victory in the earlier appeal, *Johnston v. Borders*, and because many of the hours her attorneys spent were incurred in opposing Defendants' vexatious litigation.

Third, Johnston argues that the District Court erred in failing to tax the following as costs against Defendants: (1) a videotaped deposition of Major Longo; (2) the transcript of a video news piece; (3) photocopying of caselaw, deposition transcripts, and expert reports; (4) the filing fee for appeal; and (5) rush service for subpoenas.

We review a district court's award of attorney's fees and costs for an abuse of discretion. *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1351 (11th Cir. 2008) (per curiam); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).  An abuse of discretion occurs when a court makes "a clear error of judgment, fails to follow the proper legal standard or process for making a determination, or relies on clearly erroneous findings of fact." *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 846 F.3d 1159, 1163 (11th Cir. 2017).  A finding of fact—whether adopted by the court from a

magistrate judge's report and recommendation or made by the court independently—is clearly erroneous if the evidence, viewed in the light most favorable to the finding, does not support the finding. *LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir. 1988). With these standards in hand, we turn to the issues the parties have raised.

### A.

We first address the issue of whether the District Court erred in including in the lodestar the time the attorneys spent working on the defamation claim. We conclude that the Court erred.

The "American Rule" holds that each party in a case bears its own attorney's fees. Congress can override this common law rule via statute. Under § 1988(b), when a party prevails on a § 1983 claim, it is entitled to a reasonable attorney's fee for the work expended on that claim. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939 (1983). It goes without saying that the work cannot include hours spent on an unrelated matter that is non-compensable under § 1988. *Norman v. Housing Auth. of Montgomery*, 836 F.2d 1292, 1302 (11th Cir. 1988).

The parties do not dispute that Johnston was a prevailing party on her § 1983 due process claim against the Sheriff. Thus, a reasonable fee, "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case," must be

18-14808                Opinion of the Court                57

awarded. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552, 130 S. Ct. 1662, 1672 (2010). The proper approach in applying a federal fee-shifting statute like § 1988 is to take a reasonable number of hours and multiply it by a reasonable fee and thereby create a "lodestar." *Perdue*, 559 U.S. at 552, 130 S. Ct. at 1672; *Ne. Eng'rs Fed. Credit Union v. Home Depot, Inc.* (*In re Home Depot*), 931 F.3d 1065, 1090 (11th Cir. 2019).[53] Then, once created, there is a strong presumption that this lodestar will produce a reasonable attorney's fee. *Perdue*, 559 U.S. at 554, 130 S. Ct. at 1673.

Under § 1988, an attorney's fee may be awarded for time spent in pursuing a non-fee shifting claim, if the time spent is related to a fee-shifting claim based on a "common core of fact or . . . related legal theories." *Hensley*, 461 U.S. at 435, 438.[54] Although there is "no certain method" for determining relatedness, an attorney representing a party prosecuting a fee-shifting claim, as in the case here, should "maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Id.* at 437 & n.12.

---

[53] Johnston argues that fee-shifting cases outside the civil rights context are not germane to the analysis in this case. The Supreme Court observed, however, that fee-shifting rules "are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'" *Hensley*, 461 U.S. at 433 n.7, 103 S. Ct. at 1939 n.7.

[54] Of course, the hours spent may also be compensable under state law. As we note later on, however, there is no argument in this case that the state-law defamation claim Johnston pursued would be compensable under Florida law.

The question we must answer is whether the District Court erred in including the time counsel spent working on Johnston's state-law defamation claim in the lodestar .[55]   The District Court held that the defamation claim was related to the due process claim because the claims were "necessarily intertwined."   Hence, the hours Johnston's attorneys spent in working on the defamation claim were properly included in creating the lodestar.

On appeal, Defendants argue that these claims are unrelated. Johnston counters with the argument that they share a common core of fact, such that it was appropriate to include the time spent litigating the defamation claim in the lodestar.   Johnston points out that Ferguson's defamatory comments to a volunteer led that volunteer to talk to others, and the resulting clamor alerted Captain Luce and Major Longo to the euthanasia issue—which resulted in her termination.

Whether two claims are related turns on the evidence needed to prove them.[56]   *Cazares*, 638 F.2d at 1291; *Williams v.*

---

[55] Recall that the defamation claim was asserted against the Sheriff, in his official capacity, and Ferguson in Counts II through V of Johnston's amended complaint and against the Sheriff in his official capacity in Count VI.

[56] Both parties miss the mark by citing supplemental jurisdiction cases to support their contentions about the common "core" of fact test.   We think the proper test is not one of supplemental jurisdiction under 28 U.S.C. § 1367, which has a "common nucleus of operative fact" test developed by the Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S. Ct. 1130 (1966).   Though the "common core of fact" test under *Hensley* sounds like the

*Roberts*, 904 F.2d 634, 640 (11th Cir. 1990).  Most circuits address-ing the issue take an "evidentiary approach," focusing on any over-lap in the development of the needed evidence and how such evi-dence will be presented at trial.[57]  *See, e.g., Gen. Dynamics Corp. v. Horrigan*, 848 F.2d 321, 326 (1st Cir. 1988) ("Although some of the preparation may be material to both claims (e.g., discussions with the plaintiff, preparations for the plaintiff's testimony), much of it will be readily demarcated between claims."); *Goodwin v. Metts*, 973 F.2d 378, 383 (4th Cir. 1992) ("Appellants' attorneys could easily have presented evidence establishing each element of

---

"common nucleus of operative fact" test under *Gibbs*, they are different tests because they focus on different aspects of the case.  One is jurisdictional—the power of the court to try claims together—while the other is an award of at-torney's fees—focusing on how difficult it is to separate out compensable and non-compensable tasks.  The Supreme Court in *Hensley* noted that in decid-ing whether claims are "related" the district court has discretion, something necessarily at odds with a jurisdictional inquiry.  *Hensley*, 461 U.S. at 436–37.  Though *exercising* supplemental jurisdiction is discretionary once a common nucleus of operative fact is shown, if there is no common nucleus of fact, the district court has no jurisdictional power to hear a state law claim at all.  *See Ray v. Tenn. Valley Auth.*, 677 F.2d 818, 826 (11th Cir. 1982); *Owen Equip-ment & Erection Co. v. Kroger*, 437 U.S. 365, 371 (1978) ("*Gibbs* delineated the constitutional limits of federal judicial power.").

[57] Alternatively, the Seventh and Ninth Circuits state their interpretation of the relevant test as "whether relief sought on the unsuccessful claim 'is in-tended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised.'"  *Thorne v. City of El Segundo*, 802 F.2d 1131, 1141 (9th Cir. 1986) (quoting *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1279 (7th Cir. 1983)).

Appellants' malicious prosecution claims without developing the facts surrounding the entire sequence of events from the arrest of Goodwin and Hallman to their acquittal."); *Tidwell v. Fort Howard Corp.*, 989 F.2d 406, 412–13 (10th Cir. 1993) (stating that claims were related because "there was one bundle of proof presented on the three issues" and it was impossible to separate "work on the core issue"). In this area, we have stated that a district court "wisely declined to dissect the interlocking evidence and consider it in isolation as supporting only one claim or the other." *Williams*, 904 F.2d at 640. While the interrelatedness inquiry is hardly precise, a variety of factors can be helpful to consider. They include the elements of the claims, the evidence that would be relevant at trial, and whether separate trials would be proper. At all times, a court should focus on the evidence that will be introduced to prove the claims at trial.

Once again, the question here is whether Johnston was entitled to seek an attorney's fee under § 1988 for time her attorneys spent litigating the defamation claim against Ferguson, because such time was necessarily intertwined with the time spent litigating the due process claim.[58] The vast majority of work performed on Johnston's due process claim and her defamation claim is severable. While we have stated that "courts have expansively treated claims as being related," we have never held claims this disparate

---

[58] As noted *supra* in note 48, Johnston is not entitled to seek any attorney's fees against Ferguson.

18-14808                  Opinion of the Court                    61

as related.  *See Popham*, 820 F.2d at 1579.  As we noted earlier, the elements of common law defamation under Florida law are,

> (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory.

*Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1105–06 (Fla. 2008). By contrast, a name-clearing hearing claim (disregarding *Monell* for a moment) requires,

> (1) a false statement, (2) of a stigmatizing nature, (3) attending a governmental employee's discharge, (4) that was made public, (5) by the governmental employer, (6) without a meaningful opportunity for an employee name clearing hearing.

*Cotton*, 216 F.3d at 1330.  Most of these elements as applied to this case have no evidentiary overlap.  First, it is critical that the Sheriff's public statement supplied almost all the evidence that Johnston needed to prove her due process claim and was irrelevant to her defamation claim against Ferguson.[59]  Further, Ferguson's mental

---

[59] The Sheriff's October 10, 2014, statement would have established publicity, stigma, and that the statement attended her discharge.  With minimal effort, Johnston could also prove that the statement was false, and that the Sheriff is a government employer.  This was confirmed by the fact that most evidence

state, her statement to one volunteer, Boylston, and the resulting injury to Johnston were inapposite and irrelevant in prosecuting the procedural due process case against the Sheriff.[60]  Likewise, evidence of the Sheriff's press release, Johnston's discharge, and the failure of the Sheriff to provide Johnston with a meaningful opportunity to clear her name has no bearing on the defamation claim against Ferguson.  And even if Ferguson's comment to Boylston was the sole impetus for Johnston's termination, the *reason* for the firing was irrelevant to the injury that the denial of a name-clearing hearing may have caused Johnston.  *See* Fed. R. Evid. 401.

Moreover, while the defamatory language element of defamation is similar to the stigmatizing statement element of the due process claim, the evidence used to satisfy these elements may differ significantly.  *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1302 (11th Cir. 2001) (stating that stigma plus is essentially defamation, implicating "a person's good name, reputation, honor, or integrity," combined with an alteration in legal status).  The difference in evidence stems from the fact that the proof of defamation turns on the individualized qualities of the statements and the context in which they are made.  Restatement (Second) of Torts § 559 ("A communication is defamatory if it tends so to harm the

---

at trial related to Johnston's defamation claim against Ferguson.  *See infra* note 62.

[60] We say this although the District Court's instructions on damages on the due process claim and the defamation claim were much alike.  *See supra* note 24.

reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."). Accordingly, there is little evidentiary overlap when the statements and their contexts are different, even if the statements may impugn a person's reputation in similar ways. In proving Ferguson's statement defamatory, the evidence relating to the Sheriff's press release would simply be irrelevant, and vice versa.

It is true that falsity is an element of both the due process and defamation claims. But again, the differences in the statements here are stark; they were made by different persons at different times. Both statements dealt with Johnston's involvement in the euthanasia. Ferguson's defamatory statement was that Johnston told her that she was to euthanize animals that had been at the shelter "over a certain amount of time." This statement was proven false because the evidence showed that Johnston had different euthanasia criteria: behavioral or medical issues making the animals unadoptable. The Sheriff's defamatory statement was that Johnston "directed" the euthanasia, meaning that she played an active role. The Sheriff's statement, however, would not be disproved by evidence of differing criteria, and that evidence, which played a central role in showing Ferguson's statement to be false, would be irrelevant in proceedings against the Sheriff. Johnston could have played an active role even if her criteria for euthanasia were different. It was the fact that she was unaware of the euthanization and not present at the shelter that made the Sheriff's statement false. And the development of these strands of evidence would also have

been different.  The uncovering of evidence showing that Johnston was in Miami at the time is far different from uncovering what Johnston had initially told Ferguson about euthanasia criteria.

Moreover, our goal in this inquiry is to focus on the overall picture of the case—whether the facts are "inextricably inter-twined." *Metts*, 973 F.3d at 378.  That a shred of evidence could be relevant to another claim should not be the basis of awarding a sub-stantial attorney's fee for the work done in a non-fee-shifting set-ting.[61]  The minute evidentiary overlap present here cannot consti-tute common *cores* of fact.  The claims against Ferguson arose pri-marily from Ferguson's statement made before Johnston's firing, whereas the claim against the Sheriff arose from Johnston's termi-nation and a press release later that day.  *See Lenardo v. Argento*, 808 F.2d 1242, 1247 (7th Cir. 1987) ("Sequential claims—claims that are causally related (Lenard wouldn't have been beaten if he hadn't been arrested) but do not depend on the same facts—are not re-lated for purposes of *Hensley*.").  And finally, the evidence adduced at trial confirms our analysis, because most of that evidence was related to the defamation claim against Ferguson, not Johnston's

---

[61] And if time developing evidence for a non-fee-shifting claim inevitably would be spent on a fee-shifting claim, those hours would be reasonable and thus compensable. *See Webb v. Bd. Educ. Dyer Cnty.*, 471 U.S. 234, 243, 105 S. Ct. 1923, 1928–29 (1985) (focusing on whether "any discrete portion of the work product from the administrative proceedings was work that was both useful and of a type ordinarily necessary" to later successful litigation).

18-14808                Opinion of the Court                    65

due process claim.[62]  It would not have been, as the District Court asserted, "impossible to accurately apportion the time" spent on developing evidence between these two claims.  Thus, the state-law defamation claim and the due process claim were and are unrelated.

Because the defamation claim and the due process claim are unrelated, it was error for the District Court to consider the hours expended on the defamation claim in determining the lodestar. *Norman*, 836 F.2d at 1302; *see also Millea v. Metro-North R. Co.*, 658 F.3d 154, 168 (2d Cir. 2011).  In *Norman*, we held that "in determining reasonable hours the district court must deduct time spent on discrete and unsuccessful claims." *Norman*, 836 F.2d at 1302 (citing *Hensley*, 461 U.S. at 435, 103 S. Ct. at 1940).  This error

---

[62] The testimony of four of Johnston's nine witnesses—volunteer (and later Director of Animal Services) Whitney Boylston, veterinarian tech Diane Hagan, euthanasia tech Melonie Hollis, and Ferguson—almost exclusively developed evidence on Johnston's defamation claim against Ferguson.  It is true that some of these witnesses briefly discussed the Sheriff's Office euthanasia policy, which was relevant to proving that the Sheriff's press release contained false statements.  However, their discussions were relatively brief and largely duplicative of the testimony elicited from Major Longo and the Sheriff on the policy.  Johnston's two expert witnesses, Christopher Anderson and Robert Tremp, talked about Johnston's damages to her reputation.  Their testimony addressed her defamation claim against Ferguson, given that damages are not the proper remedy for a name-clearing hearing. *McKinney*, 20 F.3d at 1557; *see also Codd*, 429 U.S. at 627, 97 S. Ct. at 884.  The witnesses used to build out the due process claim were Major Longo and the Sheriff.  Johnston's own testimony relayed the factual background of the case and supported both claims by showing why both Ferguson and the Sheriff's statements were false.

rendered the District Court's attorney's fee award an abuse of discretion and requires that we vacate it. On remand, the District Court must hold Johnston to her burden of proof so that it can identify the non-compensable hours and adjust the lodestar accordingly.[63] *See Loranger*, 10 F.3d at 783; *Hensley*, 461 U.S. at 437, 103 S. Ct. at 1941.

It bears repeating that Johnston had the burden of establishing the hours her attorneys spent in preparing for and prosecuting her due process claim against the Sheriff. *Norman*, 836 F.2d 1292, 1303 (11th Cir. 1988). So that she could carry that burden, her attorneys had to maintain records so to enable the District Court, in complying with Federal Rule of Civil Procedure 52(a)(1), to make findings of fact and conclusions of law that would allow this Court to conduct meaningful appellate review. *Loranger*, 10 F.3d at 782; *In re Home Depot*, 931 F.3d at 1089; *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1261 (11th Cir. 2020). The District Court found that,

> A review of the records submitted by both attorney Gordon and attorney Root shows substantial use of block billing, much of which involves seemingly unrelated tasks. While the hours expended might be reasonable, it is impossible for the Court to make such a determination because the billing fails to specify the amount of time spent on the various tasks.

---

[63] Because we vacate the attorney's fee award, we need not discuss other issues the parties have presented concerning the award.

The Magistrate Judge said that "Gordon's failure to refrain from block billing has made review of Defendants' claims that [he] spent excessive time litigating this case and preparing Plaintiff for her testimony at trial difficult, if not impossible."

We encountered a similar situation in *ACLU of Georgia v. Barnes*, 168 F.3d 423 (11th Cir. 1999). Because the attorney's lumping together of two or more unrelated tasks in a single billing entry made it "difficult, if not impossible, to calculate with any precision the number of hours an attorney devoted to a particular task," we set aside the fee award. *Id.* at 429.

In this case, the District Court solved the problem by reducing Gordon's hours by 10 percent and Root's by 15 percent. The reductions were arbitrary. This resolution was as if the Court put its finger on the scale in Johnston's favor—absolving her of her burden of proof. A district court "must do more than eyeball the request and if it seems excessive cut it down by an arbitrary percentage." *Heiar v. Crawford Cnty.*, 746 F.2d 1190, 1204 (7th Cir. 1984). It is obligated to "articulate the decisions it made, give principled reasons for those decisions, and show its calculation." *In re Home Depot*, 931 F.3d at 1089.

## B.

Lastly, we conclude that the Court did not err with respect to costs.

Costs are generally awarded to the prevailing party under Federal Rule of Civil Procedure 54(d)(1). Fed. R. Civ. P. 54(d).

These costs are limited by the six categories listed in 28 U.S.C. § 1920.[64] On appeal, Johnston objects to five costs the District Court refused to tax: (1) a videotaped deposition of Major Longo; (2) the transcript of a video news piece; (3) photocopying of caselaw, deposition transcripts, and expert reports; (4) the filing fee for appeal; and (5) rush service for subpoenas.

The Magistrate Judge found in his R&R that Johnston provided "little argumentation or information" with respect to these costs and "failed to explain, cite to authority, or otherwise justify why the challenged costs are recoverable." Thus, the Magistrate

---

[64] Section 1920 states:

> A judge or clerk of any court of the United States may tax as costs the following:
>
> (1) Fees of the clerk and marshal;
>
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
>
> (3) Fees and disbursements for printing and witnesses;
>
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
>
> (5) Docket fees under section 1923 of this title;
>
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree. 28 U.S.C. § 1920.

Judge concluded that Johnston failed to meet her burden of proof. *See Loranger*, 10 F.3d at 784.

Both sides filed objections to the R&R. The District Court overruled all but one of Johnston's objections and partially adopted the R&R stating that Johnston "has not shown that costs incurred were reasonable or necessary." The District Court necessarily reviewed the Magistrate Judge's determinations in light of the record before the Magistrate Judge because he did not consider any supplemental evidence. *See United States v. Raddatz*, 447 U.S. 667, 675, 100 S. Ct. 2406, 2412 (1980). Based on the record and the rationales in the objections, however, we cannot say that the reading of the evidence by the Court was impermissible. *See Anderson*, 470 U.S. at 574, 105 S. Ct. at 1511.[65]

---

[65] Some of these costs are clearly *unrecoverable*, such as postage costs. *Duckworth v. Whisenant*, 97 F.3d 1393, 1399 (11th Cir. 1996). Other costs require that a party show that they were "necessarily obtained for use in the case." *Loughan v. Firestone Tire & Rubber Co.*, 749 F.2d 1519, 1526 n.2 (11th Cir. 1985). It was not clear error to find unnecessary a transcript of a video news piece that was already before the jury simply so they could have it in the jury room. *See EEOC v. W & O, Inc.*, 213 F.3d 600, 623 (11th Cir. 2000). And while we have not resolved whether "rush service" from private processors are compensable, it would be a permissible reading of this record that service of Sheriff's Office employees could have been served in advance. *See id.* at 624. As for the denial of costs for additional copies of caselaw and deposition transcripts, we do not see clear error.

The only cost the Magistrate Judge took into detailed consideration is the cost of a video deposition. Johnston asserts the same argument here as

Additionally, Johnston claims that her entitlement to the appellate filing fee is self-evident from the mere fact that the appeal was docketed. We disagree. Under the Federal Rules of Appellate Procedure, "if a judgment is affirmed in part, reversed in part, modified, or vacated, costs are taxed only as the court orders." Fed. R. App. Proc. 39(a). When we vacated and remanded the case in *Johnston v. Borders*, 724 F. App'x 762, 768 (11th Cir. 2018), our opinion did not say anything about appellate costs. Thus, it would have been improper to grant an appellate filing fee associated with that appeal. *See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 117 F.3d 1328, 1340 (11th Cir. 1997) ("Where this court's order fails to explicitly grant a class of costs, we must interpret that silence as a rejection of those costs."). We accordingly affirm the District Court's determinations as to costs.

In Appeal No. 18-14808, we **AFFIRM** the District Court's judgment. In Appeal No. 19-13269, we **AFFIRM** the Court's

---

below for the necessity of videotaping the deposition of Major Longo—that they were worried he would not show up for trial. Because of Defendants' failure to give Major Longo's address, the release of which would violate a Florida statute, Fla. Stat. § 119.071(4)(d)(2)(a), Johnston stated that she could not tell whether Major Longo was within the subpoena power of the District Court. But Major Longo was a critical witness of Defendants, Defendants stated that they would call him, and then did call him. It was obvious that Defendants would call Major Longo and thus preserving a video copy of his deposition was not necessary. It was not clear error to disallow this cost. *See W & O, Inc.*, 213 F.3d at 623 (stating the test as whether an applicant reasonably could have believed it necessary for use in the case).

judgment as to costs, and **VACATE** its judgment as to attorney's fees and **REMAND** the issue of attorney's fees for further proceedings.

    **SO ORDERED.**

JORDAN, Circuit Judge, concurring:

As to Case No. 18-14808—the appeal of the jury verdicts—I concur with the court's opinion. But I do so subject to two caveats.

First, having been on the panel that decided the first appeal in this case, *see Johnston v. Borders*, 724 F. App'x 762 (11th Cir. 2018), I would not characterize the due process portion of that decision—which arose in a summary judgment posture—as "dubious." Maj. Op. at 19 n. 18. We take cases as briefed by the parties, and the Sheriff argued that certiorari and mandamus were available to Ms. Johnston to cure the alleged lack of notice. *See* Answer Br. of Gary Borders, No. 17-10642, 2017 WL 2463102, at *14 (June 5, 2017) ("[A] petition for writ of mandamus or certiorari in a Florida state court could have cured [Ms. Johnston's] lack of notice."). Ms. Johnston's claim, however, was not limited to lack of notice and also included reputational harm due to the lack of a name-clearing hearing. The panel therefore found the Sheriff's argument wanting. *See Johnston*, 724 F. App'x at 766–67.

Second, I respectfully disagree with the court's suggestion (in dicta) and Judge Tjoflat's express statement (in a separate concurrence) that an injunction requiring a name-clearing hearing is the *only* remedy available in a case like this one. *See* Maj. Op. at 14 n. 13, 27 n. 25; Tjoflat Concurrence at 2–10. As a number of courts have held, nominal and compensatory damages may be available to a discharged employee if granting a name-clearing hearing many years after the fact would not "reverse any ill effects" from the denial or inadequacy of a hearing. *See Patterson v. City*

*of Utica*, 370 F.3d 322, 337–38 (2d Cir. 2004); *McGhee v. Draper*, 639 F.2d 639, 644–45 (10th Cir. 1981); *Burt v. Abel*, 585 F.2d 613, 616 (4th Cir. 1978); *Snowden v. Adams*, 814 F. Supp. 2d 854, 874 (C.D. Ill. 2011). *See also Ersek v. Township of Springfield*, 102 F.3d 79, 84 n.6 (3d Cir. 1996) (noting uncertainty on the issue but remarking in dicta that "a name-clearing hearing might be insufficient to cure all the harm caused by stigmatizing government comments"). *Cf. Howe v. Baker*, 796 F.2d 1355, 1358–60 (11th Cir. 1986) (holding that defendants were entitled to qualified immunity in 42 U.S.C. § 1983 "stigma plus" action for damages). Given the way this case was litigated, we have no occasion to opine on the availability of compensatory damages.

With respect to Case No. 19-13269—the appeal of the award of attorney's fees and costs—I concur in and join Part II.B of the court's opinion. As to Part II.A, I agree that we must reverse and remand because not all of the time spent by Ms. Johnston's counsel on the defamation claim is compensable under 42 U.S.C. § 1988. I therefore concur in the judgment in Part II.A.

I do not join Part II.A because the "relatedness" of the due process claim and the defamation claim presents a closer question for me. Although the due process claim stems initially from the Sheriff's press release and the defamation claim stems initially from Ms. Ferguson's comments, the two claims revolve around the core accusation that Ms. Johnston directed the euthanasia of more animals than necessary or warranted in violation of standing policy. And both claims require a number of common elements – (1) the

18-14808                JORDAN, J., Concurring                3

falsity of the accusation; (2) the publication of the accusation; and (3) the stigmatizing or defamatory nature of the accusation. *See* Maj. Op. at 64–66. In my opinion, some of the time spent by Ms. Johnston's counsel on the defamation claim could be compensable under § 1988 (assuming, of course, that counsel has satisfied her burden of satisfactorily explaining the overlapping work through billing records and other evidence).

Finally, the court says that the district court's percentage reductions were "arbitrary." Maj. Op. at 69. If the court is basing that conclusion on its understanding that the district court did not hold Ms. Johnston to her burden of proof, then the statement is sufficiently qualified. But if the court is making a broader pronouncement, I do not agree. Our precedent permits across-the-board reductions of the number of hours or the final lodestar figure in some cases so long as the district court provides a "concise[ ]" and "clear[ ]" explanation of its reasons. *See Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994).

18-14808        Tjoflat, J., Specially Concurring        1

Tjoflat, Circuit Judge, Specially Concurring:

I concur in the Court's judgment and the reasons expressed in support of it. I write separately to point out that Count I was insufficient to state a Due Process Clause claim for damages. I concur in the Court's judgment on Count I because the Sheriff effectively consented to the District Court's submission of the claim for damages to the jury.

The gravamen of Count I was that the Sheriff did not inform Johnston of her right to a post-termination name-clearing hearing and thus did not provide her with one. As explained in Part I below, a name-clearing hearing, not money damages, was the process the Due Process Clause required the State—here the Sheriff (in his official capacity) *qua* State—to provide. If the Sheriff actually denied her request for such process and the Florida courts would not thereafter provide it, the District Court would provide it under 42 U.S.C. § 1983. It would issue an injunction ordering the Sheriff to afford Johnston the hearing she requested.[1]

But Johnston took none of these steps. Instead of a name-clearing hearing, she sought damages, a remedy the Due Process Clause did not require the State to provide. In essence, she

_____

[1] The deprivation of a name-clearing hearing "is not complete," and a claim under the Due Process Clause does not arise "unless and until the State fails to provide due process," i.e., a name-clearing hearing. *Zinermon v. Burch,* 494 U.S. 113, 126, 110 S. Ct. 975, 983 (1990). Therefore, Johnston's due process claim for a name-clearing hearing would not arise until the Florida courts refused to order the Sheriff to provide her with one.

converted the Count I due process claim into a state law tort claim, one that closely resembled the defamation claim she brought against Ferguson.

## I.

"Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation." *Siegert v. Gilley*, 500 U.S. 226, 233, 111 S. Ct. 1789, 1794 (1991) (citing *Paul v. Davis*, 424 U.S. 693, 708–09, 96 S. Ct. 1155, 1164–65 (1976). If the defamation "occur[s] in the course of the termination of employment," however, the due process right to a name-clearing hearing is triggered.[2] *Paul v. Davis*, 424 U.S. at 710, 96 S. Ct. at 1165. This linking of the defamation with the loss of employment is known as the "stigma-plus" test. *Cannon v. City of West Palm Beach*, 250 F.3d 1299, 1302 (11th Cir. 2001) (quoting *Moore v. Otero*, 557 F.2d 435,

---

[2] In *Paul v. Davis,* the Supreme Court stated that its cases,

> ha[d] recognized the serious damage that could be inflicted by branding a government employee as "disloyal," and thereby stigmatizing his good name. But [it] ha[d] never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment.

424 U.S. at 706, 96 S. Ct. at 1163. We reiterated this point in *Cannon v. City of West Palm Beach,* 20 F.3d 1299, 1303 (11th Cir. 2001) ("*Absent a discharge or more, injury to reputation* is not a protected liberty interest" under the Due Process Clause." (emphasis added)).

18-14808          TJOFLAT, J., Specially Concurring          3

437 (5th Cir. 1977)).   A name-clearing hearing *is the remedy* the
Due Process Clause provides.   *Codd v. Velger*, 429 U.S. 624, 627,
97 S. Ct. 882, 883–84 (1977) ("[T]he remedy mandated by the Due
Process Clause of the Fourteenth Amendment is 'an opportunity
to refute the charge.' ").[3]   A name-clearing hearing is an equitable
remedy.   The federal courts only provide the remedy if the state
courts are unable to do so.   Equity steps in for the obvious reason
that the remedy at law, money damages, is inadequate to compen-
sate for the denial of the hearing.[4]   With these thoughts in mind, I
consider   the   errors   the   District   Court   committed   in   handling

---

[3]  "Because [the hearing] is provided simply to cleanse the reputation of the
claimant, the hearing need not take place prior to his termination or to the
publication of related information adverse to his interests."  *Campbell v.
Pierce Cnty.*, 741 F.3d 1342, 1345 (11th Cir. 1984).  This is so because the hear-
ing is "not to avert the unjustified denial of a specific benefit, but to allow the
aggrieved party to 'clear his name.' "  *Id.* (citing *Codd,* 429 U.S. at 627, 97 S.
Ct. at 884.  Thus, in Johnston's situation, the hearing would not be for the
purpose of saving her job; rather, it would be convened for the sole purpose
of clearing her name.

[4]  *See Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1527 (11th Cir. 1994) ("It is
axiomatic that equitable relief is only available where there is no adequate
remedy at law; cases in which the remedy sought is the recovery of money
damages do not fall within the jurisdiction of equity.").  In fashioning an equi-
table remedy—specifically an order requiring a name-clearing hearing—a
court could award the employee the expenses incurred in obtaining the hear-
ing.  But the sort of money damages awardable pursuant to the District
Court's jury instructions on the Count I due process claim in this case would
be out of the question.

4                    TJOFLAT, J., Specially Concurring              18-14808

Count I.[5]  The errors were committed without the Sheriff's objection and thus are not before us now.

Count I sought compensatory and punitive damages for the Sheriff's failure to provide Johnston with a name-clearing hearing, remedies having no support in the relevant due process jurisprudence.  The Sheriff, acting in his individual capacity only, unsuccessfully moved the District Court to dismiss Count I for failure to state a claim, but not on the theory that the Due Process Clause did not support its claim for damages.  He subsequently moved the Court for summary judgment on Count I in his individual and official capacities on the ground that Johnston failed to "show that the State of Florida "refused to provide a process sufficient to remedy the procedural deprivation," citing "*McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994)."[6]  The District Court granted the

---

[5] The errors resulted from the District Court's failure to recognize that the process due Johnston under the Due Process Clause was a name-clearing hearing, not damages.  The failure was invited by the attorneys representing Johnston and the Sheriff who treated Count I as a claim for damages.

[6] The Sheriff's position was this:

> The Sheriff's Office and Sheriff Borders individually are entitled to judgment as a matter of law with respect to Plaintiff's claim that she was denied procedural due process. In order to recover on a procedural due process claim for deprivation of liberty interest, Johnston must show that (1) a false statement (2) of stigmatizing nature, (3) attending her termination, (4) was made public (5) by the public employer (6) without a meaningful opportunity for an employee name clearing

18-14808        TJOFLAT, J., Specially Concurring        5

motion on the ground that Johnston failed to secure a state court injunctive order requiring the Sheriff to provide her a name-clearing hearing. "Because an adequate state court remedy was available to Johnston, her failure to pursue that remedy dooms her procedural due process claim," the Court so held.[7]

Johnston appealed the ruling. The issue before the panel of this Court was whether the state courts could order the Sheriff to provide Johnston a name-clearing hearing. The Sheriff argued that

_____

hearing. *Cotton v. Jackson*, 216 F.3d 1328, 1330 (11th Cir. 2000). She must also show that the State of Florida "refused to provide a process sufficient to remedy the procedural deprivation." *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994). Johnston cannot establish a claim for deprivation of her liberty interest because (1) neither the Sheriff's Office, nor Borders made a false statement; (2) Johnston was afforded a name-clearing hearing; (3) adequate state remedies were available to provide Johnston with the opportunity for a name clearing hearing. Additionally, Plaintiff's liberty interest claim against Sheriff Borders individually is barred by the doctrine of qualified immunity.

Notably, the Sheriff did not expressly contend that to make out a due process claim (cognizable under 42 U.S.C. § 1983) against him for failure to provide a name clearing hearing, Johnston had to first ask him to provide a hearing and, if he declined to provide one, the Florida state courts refused to order him to do so.

[7] At this point, no one—not Johnston, nor the Sheriff nor the District Court—expressly noted for the record that Count I was not seeking "an adequate state court remedy," i.e., an injunctive order requiring the Sheriff to provide a name-clearing hearing.

6                TJOFLAT, J., Specially Concurring        18-14808

the state courts could do so via "a writ of certiorari or a writ of mandamus."[8] *Johnston v. Borders*, 724 F. App'x 762, 766 (11th Cir. 2018). The panel held that neither remedy was available under Florida law and therefore reversed the District Court's summary judgment holding to the contrary. The panel's opinion does not indicate whether the panel considered whether a Florida circuit court, which is the State's court of general jurisdiction,[9] would entertain a federal constitutional claim—specifically, the Fourteenth Amendment due process claim asserted in Count I. I assume it would.

The panel's holding was, in effect, that Johnston had established a due process violation. The deprivation of Johnston's right to a name-clearing hearing was "complete" because, according to the panel, "the State [would have] fail[ed] to provide due process." *Zinermon v. Burch*, 494 U.S. 113, 126, 110 S. Ct. 975, 983 (1990). Because the deprivation was complete, the District Court, on

---

[8] The en banc *McKinney* Court held that certiorari review was available under Florida law as the remedy in that case. 20 F.3d at 1563.

[9] The Florida Constitution states that "[c]ircuit courts of the State of Florida have exclusive jurisdiction of all cases in equity, all cases at law, and all criminal cases not cognizable by inferior courts." Fla. Const. art V, § 11; *see also English v. McCrary*, 348 So. 2d 293, 297 (Fla. 1977) ("In this state, circuit courts are superior courts of general jurisdiction, and nothing is intended to be outside their jurisdiction except that which clearly and specially appears so to be."). Florida statutes state that the circuit courts have "exclusive original jurisdiction" over "all actions at law not cognizable by the county courts," as well as "all cases in equity." Fla. Stat. § 26.012.

18-14808        TJOFLAT, J., Specially Concurring        7

remand, would have to provide the process due Johnston—a name-clearing hearing. But Johnston was not seeking the process that was due. *Codd*, 429 U.S. at 627, 97 S. Ct. at 883–84. Instead, she wanted compensatory and punitive damages.[10]

On remand, Johnston moved the District Court to enforce the *Johnston v. Borders* mandate. Among other points, she argued that the mandate established that because the Sheriff failed to inform her of her right to a name-clearing hearing[11] and then provide one, she did not need to prove the sixth element of her Count I due process claim: that she was discharged "without a meaningful opportunity for employee name clearing." 742 F. App'x at 766. The District Court agreed. It held, albeit implicitly, that to establish her Count I claim, Johnston did not have to request a name-clearing hearing; the mere fact that the Sheriff had not provided one on his own initiative proved that he had denied her due process of law.

The District Court's ruling was inexplicable, especially so when one considers what, according to the Court, Johnston had to prove in seeking damages (for the Sheriff's failure to provide a name-clearing hearing) and what she would have had to prove if

---

[10] The Sheriff, at least in his individual capacity, understood this, which explains why he interposed the defense of qualified immunity. *See supra* notes 12, 19. Qualified immunity is a defense to a claim for damages. It is not a defense to a claim for injunctive relief—here, an order requiring the provision of a name-clearing hearing.

[11] As the panel stated in *Johnston v. Borders,* "Sheriff Borders admitted that he did not know what a name-clearing hearing was." 742 F. App'x at 766.

she had sought an injunction (ordering the Sheriff to provide a name-clearing hearing). To obtain an injunction, Johnston would have had to prove (1) that she requested the Sheriff to provide a hearing because the statements in his October 10, 2014, press release were false and stigmatizing; (2) that he denied her request, and (3) that the Florida courts refused to entertain her application for an injunction ordering the Sheriff to provide a hearing. As the Supreme Court stated in *Zinermon*, "[t]he constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." 494 U.S. at 126, 110 S. Ct. at 983.

Now consider what the District Court required Johnston to prove to establish her claim for damages under § 1983. She did not have to prove points (1) through (3) above. All she had to prove was that the Sheriff's statements were false and stigmatizing, and that he failed to give her a name-clearing hearing. The Sheriff admitted that she did not receive a name-clearing hearing, so her burden was simply to establish that statements in the Sheriff's Office press release were false and stigmatizing and caused her to sustain the losses described in the Court's jury instructions.[12] In time, Johnston recovered damages even though the deprivation she complained of was not complete and a due process claim could not lie.

---

[12] Recall that the instructions were administered without the Sheriff's objection.

18-14808        TJOFLAT, J., Specially Concurring            9

I close my discussion with an observation about a statement this Court made in *Buxton v. City of Plant City*, a case in which stigmatizing information was placed in discharged police officer's personnel file was made public necessitating a post-termination name-clearing hearing. 871 F.2d 1037, 1046 (11th Cir. 1989). After acknowledging that ordering "a post-termination hearing [is the] proper remedy for employee deprived of liberty interest during termination," the Court held that when stigmatizing information is made part of the public record in connection with a state employee's termination, "[n]otice of the right to [a name-clearing hearing] is required." *Id.* In the instant case, the District Court effectively concluded that the Sheriff's failure to notify Johnston of the right to a name-clearing hearing standing alone was sufficient to prove the denial of due process alleged in Count I. The conclusion cannot be squared with *Zinermon* and *Codd*. *Codd*, 429 U.S. at 627, 97 S. Ct. at 883–84 (stating that the remedy for a stigma-plus claim is "an opportunity to refute the charge"); *see also Perry v. Sindermann*, 408 U.S. 593, 603, 92 S. Ct. 2694, 2700 (1972) (stating that due process requires the government "to grant a hearing at [the employee's] request.").[13] The employee is the party who should say that the employer's statement is false and stigmatizing.

---

[13] I also note that most of the circuit courts to consider this issue have, either implicitly or explicitly, rejected a notice requirement for stigma-plus claims. *See, e.g.*, *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 103 (1st Cir. 2002) (holding that a due process violation does not occur in the stigma-plus

10                    TJOFLAT, J., Specially Concurring          18-14808

But putting that notion aside, the employee standing in Johnston's shoes does not have a § 1983 claim for the deprivation of due process until the deprivation has actually occurred—until the state courts fail to provide a name-clearing hearing because the employer's statement on discharge was false, stigmatizing and public.

---

context until an employee requests a hearing); *Grill v. N.Y.C. Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002); *Rosenstein v. City of Dall.*, 876 F.2d 392, 396 (5th Cir. 1989); *Quinn v. Shirey*, 293 F.3d 315, 321–22 (6th Cir. 2002); *Winskowski v. City of Stephen*, 442 F.3d 1107, 1111 (8th Cir. 2006).